BARBARA A. GREENBERG, PLAINTIFF-APPELLANT, v. IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued December 10, 1984—Decided July 2, 1985.

554

*Edwin J. Jacobs, Jr.*, argued the cause for appellant (*Tort, Jacobs, Todd & Bruso*, attorneys; *Peter L. Bruso*, on the brief).

*Michael R. Clancy*, Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney; *James J. Ciancia*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

POLLOCK, J.

The issue on this appeal concerns the constitutionality of *N.J.S.A.* 52:13D–17.2b (casino ethics amendment), an amendment to the New Jersey Conflicts of Interest Law, *N.J.S.A.* 52:13D–12 to –27 (Conflicts of Interest Law). That amendment prohibits virtually all state officers and employees, including full-time members of the judiciary and their immediate families, from employment with casinos. The prohibition operates in conjunction with the New Jersey Casino Control Act, *N.J.S.A.* 5:12–1 to –152, which forbids casinos from hiring persons who are barred from accepting employment under the Conflicts of Interest Law. *N.J.S.A.* 5:12–117.1. Consequently, plaintiff, who is the wife of a Superior Court judge, is barred from casino employment.

The Law Division granted summary judgment sustaining the constitutionality of the statute. In an unreported decision, the Appellate Division affirmed, with one judge dissenting. Plaintiff appealed of right to this Court. *R.* 2:2–1(a)(2). We affirm.

I

On January 17, 1965, plaintiff married Manuel H. Greenberg, who in July 1972 was appointed a judge of the Superior Court. Earlier in 1972, the Conflicts of Interest Law became effective. That law prohibited state officers and employees, as well as their spouses, from accepting employment offered with the

intent to influence those employees or officers in the performance of their public duties. *N.J.S.A.* 52:13D–14.

In November 1976, New Jersey voters approved an amendment to the New Jersey Constitution that permitted casino gambling in Atlantic City. *N.J. Const.* (1947), art. 4, § 7, para. 2D. The following year the Legislature enacted the Casino Control Act, which is a comprehensive scheme for the regulation of casinos. In that act, the Legislature acknowledged the economic potential of the casino industry for New Jersey, particularly for Atlantic City. *N.J.S.A.* 5:12–1b(1), (3). The Legislature also recognized that the casino industry was particularly vulnerable to criminal infiltration, *N.J.S.A.* 5:12–1b(7), (9). Consequently, the Legislature determined that if casino gambling was to earn the public trust, strict regulations would be required. *N.J.S.A.* 5:12–1b(6), (7), (9), (13). Hence, the Legislature directed that the Conflicts of Interest Law should apply to Casino Control Commission (Commission) members and employees. *N.J.S.A.* 5:12–59a. From the outset of casino gambling, a spouse of a Commission member has been prohibited from employment by a casino licensee. *N.J.S.A.* 5:12–59e(5).

Plaintiff resides with her husband and sons at their home in Margate. Although she worked in various jobs before her marriage, since that time she has been engaged principally in raising her two sons, continuing her education at Atlantic Community College, and participating in community activities.

In March 1981, plaintiff received a license for employment as a casino hotel employee, a position that now requires only registration with the Commission. *N.J.S.A.* 5:12–91a. Two months later, in May of 1981, the Legislature amended the Conflicts of Interest Law by adopting the casino ethics amendment. The amendment extends restrictions on employment to "any member of the immediate family of any State officer or employee, or person * * *." *N.J.S.A.* 52:13D–17.2b. "Person" is defined to include a "full-time member of the Judiciary * * *," *N.J.S.A.* 52:13D–17.2a, and "member of the immediate family"

includes that person's spouse residing in the same household, *N.J.S.A.* 52:13D–13(i). Thus plaintiff, although free to work elsewhere, is precluded from casino employment.

## II

As an exception to the general constitutional prohibition against gambling, *N.J. Const.* (1947) art. 4, § 7, para. 2, the Atlantic City casino industry enjoys a unique status in New Jersey. Consequently, the Legislature, the Commission and the Division of Gaming Enforcement (Division) have gone to great lengths to ensure the integrity and effectiveness of casino regulation.

In the Casino Control Act, the Legislature prescribed rigorous ethical obligations for Commission and Division personnel. *N.J.S.A.* 5:12–58 to –62. The Act also directed that members and employees of the Commission and the Division would be governed by the restrictions contained in the Conflicts of Interest Law. Thereafter, in 1980, the Legislature passed the casino ethics amendment, which extended the ethical restrictions to other state officials, including judges.

We have previously recognized the strong state interest in promoting scrupulous conduct by casino industry and regulatory officials. Thus, we have held that disclosure of confidential information required in an application for casino employment did not violate a license applicant's privilege against self-incrimination, freedom of association, or privacy rights. *In re Martin*, 90 *N.J.* 295 (1982). Recognizing that casinos are a pervasively regulated business, we have also sustained the right of the Division to conduct warrantless administrative searches of employees on casino premises. *Id.* Furthermore, we have affirmed a Commission ruling that conditioned approval of a casino operating license upon the dismissal of two casino key employees with ties to organized crime. *In re Boardwalk Regency Corp. Casino License*, 90 *N.J.* 361 (1982). More to the point, we have acknowledged that in fulfilling the legislative

purpose to "ensure propriety and preserve public confidence" in government, the casino ethics amendment "vitally serves a significant governmental purpose." *Knight v. Margate,* 86 *N.J.* 374, 391–92 (1981). In describing the purpose of the amendment, Justice Handler wrote:

> The current amendment of the Conflicts of Interest Law deals specifically with the casino gambling industry. As a supplement of the Casino Control Act, as well as the Conflicts of Interest Law, [it] seeks further to sanitize casino gambling and its potentially corrupting effect upon government. Gambling is an activity rife with evil, so prepotent its mischief in terms of the public welfare and morality that it is governed directly by the Constitution itself. *N.J. Const.* (1947), Art IV, § 7, par. 2. As expressed in the Casino Control Act, which implements the Constitution's gambling clause, it is the pronounced policy of this State to regulate and control the casino industry with the utmost strictness to the end that public confidence and trust in the honesty and integrity of the State's regulatory machinery can be sustained. *Ante* at 380–381. This public policy calls for standards controlling the conduct of the State's officials and public employees in dealing with casino entities. [*Id.* at 391–92.]

Although the regulation of judicial conduct ultimately reposes in this Court, *Knight* affirmed that the legitimacy of governmental concerns about casinos compelled judicial deference to the Legislature. 86 *N.J.* at 392. Now, as then, we do not perceive that the legislative restrictions will interfere with the sound administration of the judicial system.

As in *Knight,* our attention in the present case is not on the infiltration of casinos by organized crime, but on the potential threat of the casino industry to governmental integrity, particularly that of the judiciary. We are concerned not only with impropriety, but also with its appearance, which is always more subtle than impropriety itself. The threat posed by the appearance of impropriety is particularly insidious when the concern is that casinos, with their enormous economic power, might appear to infiltrate the judiciary.

It is against this background that we view plaintiff's contentions that the casino ethics amendment violates her property and liberty interest in obtaining casino employment, as well as her right to marry and right of familial association. She bases her claims on the due process and equal protection clauses of

the fourteenth amendment to the United States Constitution and article 1, paragraph 1 of the New Jersey Constitution. Generally speaking, plaintiff asserts that the restrictions are arbitrary, overbroad, and not rationally related to any legitimate governmental objective. Evaluation of her argument implicates both the nature of her rights and the standard of review to be accorded those rights. We begin with the standards of review under the federal and state constitutions.

## III

Throughout this century, the United States Supreme Court has alternately resorted to the due process and the equal protection clauses of the fourteenth amendment to invalidate various forms of state legislation. Although both clauses are available as a means of protecting against unjustified state regulation of individual rights, they protect against different evils. When a court invalidates a statute on due process grounds, the court is saying, in effect, that the statute seeks to promote the state interest by impermissible means. *Railway Express Agency v. New York*, 336 *U.S.* 106, 112–13, 69 *S.Ct.* 463, 466–67, 93 *L.Ed.* 533, 539–40 (1949) (Jackson, J., concurring). In contrast, when a court declares a statute invalid on equal protection grounds, it is not saying that the legislative means are forbidden, but that the Legislature must write evenhandedly. *Id.*

During the first third of this century, the United States Supreme Court relied on the due process clause to invalidate various forms of economic legislation. This period is frequently described as the "Lochner Era," a reference to the Court's opinion in *Lochner v. New York*, 198 *U.S.* 45, 25 *S.Ct.* 539, 49 *L.Ed.* 937 (1905), which invalidated a state statute prescribing maximum hours of work for bakers. *See generally* Gunther, *Constitutional Law* 564–65 (1975) (discussing use of substantive due process to invalidate economic regulations). Thereafter, the Court abandoned due process analysis and looked

more to the equal protection clause to protect fundamental liberties. In the 1950's and 60's, for example, the Court employed the equal protection clause to invalidate racial segregation, *see Brown v. Board of Educ.*, 347 *U.S.* 483, 74 *S.Ct.* 686, 98 *L.Ed.* 873 (1954); legislative apportionments previously considered to be beyond the jurisdiction of the federal courts, *Baker v. Carr*, 369 *U.S.* 186, 82 *S.Ct.* 691, 7 *L.Ed.*2d 663 (1962); and laws prohibiting interracial marriages, *Loving v. Virginia*, 388 *U.S.* 1, 12, 87 *S.Ct.* 1817, 1824, 18 *L.Ed.*2d 1010 (1967). Nonetheless, the Court has returned to the due process clause to locate a "zone of privacy," *Griswold v. Connecticut*, 381 *U.S.* 479, 85 *S.Ct.* 1678, 14 *L.Ed.*2d 510 (1965), a zone that encompasses the right of a woman to choose to have an abortion, *Roe v. Wade*, 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973); the right to marry, *Zablocki v. Redhail*, 434 *U.S.* 374, 384, 98 *S.Ct.* 673, 680, 54 *L.Ed.*2d 618, 629 (1977); and the right to familial association, *Moore v. East Cleveland*, 431 *U.S.* 494, 97 *S.Ct.* 1932, 52 *L.Ed.*2d 531 (1977).

■ Insofar as most rights are concerned, a state statute does not violate substantive due process if the statute reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory. *See Nebbia v. New York*, 291 *U.S.* 502, 537, 54 *S.Ct.* 505, 516, 78 *L.Ed.* 940, 957 (1934). Briefly stated, if a statute is supported by a conceivable rational basis, it will withstand a substantive due process attack. *Williamson v. Lee Optical of Oklahoma*, 348 *U.S.* 483, 488, 75 *S.Ct.* 461, 464, 99 *L.Ed.* 563, 572 (1955); *United States v. Carolene Prods.*, 304 *U.S.* 144, 152, 58 *S.Ct.* 778, 783, 82 *L.Ed.* 1234, 1241 (1938); *see also Ferguson v. Skrupa*, 372 *U.S.* 726, 83 *S.Ct.* 1028, 10 *L.Ed.*2d 93 (1963) (explaining United States Supreme Court's reluctance to invalidate legislation that it believes to be economically unwise); L. Tribe, *American Constitutional Law* § 8–7, at 450–51 (1978) (characterizing the United States Supreme Court as willing to uphold economic legislation "for virtually no reason at all").

In the due process cases involving a "fundamental right," however, the Court applies a more exacting, although variously expressed, standard. For example, in *Roe v. Wade, supra,* 410 *U.S.* at 154, 93 *S.Ct.* at 727, 35 *L.Ed.*2d at 177, the Court held that a woman's right to privacy in reaching procreative decisions could not be abridged absent a compelling state interest. In the following year, the Court held that rules prescribing mandatory maternity leaves of public school teachers "must not needlessly, arbitrarily or capriciously impinge" on the right "to be free from unwarranted governmental intrusion in a matter so fundamentally affecting a person as the decision whether to bear or beget a child." *Cleveland Bd. of Educ. v. Lafleur,* 414 *U.S.* 632, 639–40, 94 *S.Ct.* 791, 796–97, 39 *L.Ed.*2d 52, 60 (1974), *quoting Eisenstadt v. Baird,* 405 *U.S.* 438, 453, 92 *S.Ct.* 1029, 1038, 31 *L.Ed.*2d 349 (1972). Finding that the rules placed an unjustifiably "heavy burden" on the exercise of a fundamental liberty interest, *Cleveland Bd. of Educ. v. Lafleur, supra,* 414 *U.S.* at 643, 94 *S.Ct.* at 798, 39 *L.Ed.*2d at 62, the Court declared them to be violative of the teachers' due process rights. Three years later the Court resolved to "examine carefully" a local ordinance governing family living arrangements to determine "the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore v. East Cleveland, supra,* 431 *U.S.* at 499, 97 *S.Ct.* at 1936, 52 *L.Ed.*2d at 537.

■ By comparison to the standards governing due process claims, federal equal protection analysis traditionally involves different tiers or levels of review. *See Right to Choose v. Byrne,* 91 *N.J.* 287, 305 (1982); *U.S.A. Chamber of Commerce v. New Jersey,* 89 *N.J.* 131, 157–58 (1982). If a fundamental right or suspect class is involved, the legislative classification is subject to strict scrutiny. To justify the restriction, a state must establish that a compelling state interest supports the classification and that no less restrictive alternative is available. With other rights, however, the legislative classification need only be rationally related to a legitimate interest. *See Min-*

*nesota v. Clover Leaf Creamery Co.*, 449 *U.S.* 456, 461–66, 101 *S.Ct.* 715, 722–25, 66 *L.Ed.*2d 659, 667–69 (1981).

■ Sometimes the United States Supreme Court has employed a middle-tier, or intermediate level, of scrutiny. *Right to Choose v. Byrne, supra*, 91 *N.J.* at 309 n. 7; *U.S.A. Chamber of Commerce v. New Jersey, supra*, 89 *N.J.* at 158. Under this standard, when a substantial right is affected indirectly or when a semi-suspect class, such as gender, is involved, the state interest must "serve important governmental objectives and must be substantially related to the achievement of those objectives." *Craig v. Boren*, 429 *U.S.* 190, 197, 97 *S.Ct.* 451, 457, 50 *L.Ed.*2d 397, 407 (1976) (statutory classification that permits 18- to 21-year-old women, but not men, to drink beer with alcoholic content over 3.2% is not sufficiently justified by state's interest in traffic safety, and violates equal protection). On one occasion, the Court has employed a balancing test to assay rights which, although not fundamental, are so important that the government must establish an interest more important than that of the affected class. *Plyler v. Doe*, 457 *U.S.* 202, 230, 102 *S.Ct.* 2382, 2401, 72 *L.Ed.*2d 786, 808 (1982) (state statute prohibiting alien children from attending public schools violates equal protection); *see also Bullock v. Carter*, 405 *U.S.* 134, 144, 92 *S.Ct.* 849, 856, 31 *L.Ed.*2d 92, 100 (1972) (filing fee system for candidates that appreciably impacts on exercise of right to vote and that disproportionately affects poor voters violates equal protection under close scrutiny test).

■ The standard of review varies, furthermore, with the effect of the governmental regulation upon the affected right. When the effect on a right, even a right that is fundamental, is indirect or insubstantial, the Court has applied the rational basis test and upheld a legislative classification. We glean that conclusion from two relatively recent decisions of the United States Supreme Court. In *Califano v. Jobst*, the Court addressed the question whether Congress could require termination of social security benefits to a disability recipient upon

that recipient's marriage, notwithstanding that his spouse, though not a recipient of disability benefits, was also permanently disabled. 434 *U.S.* 47, 98 *S.Ct.* 95, 54 *L.Ed.*2d 228 (1977). The Court noted that withholding benefits was not an attempt to interfere with the plaintiff's freedom to marry, despite the possibility that its effect would be to deter some people from marrying. Because the statute had a legitimate primary purpose and had only an indirect effect on the decision to marry, the Court applied a rational basis test to uphold the denial of benefits. 434 *U.S.* at 53–58, 98 *S.Ct.* at 99–102, 54 *L.Ed.*2d at 235–37.

In contrast, the Court in *Zablocki v. Redhail, supra,* 434 *U.S.* 374, 98 *S.Ct.* 673, 54 *L.Ed.*2d 618, applied a strict scrutiny standard to strike down a statute that interfered "directly and substantially with the right to marry." *Id.* at 387, 98 *S.Ct.* at 681, 54 *L.Ed.*2d at 631. The statute required that persons subject to a court-imposed obligation to pay child support had to obtain court approval to marry. To obtain approval, it was necessary to prove compliance with the support obligations and to prove that the affected children were "not then or likely thereafter to become public charges." 434 *U.S.* at 375, 98 *S.Ct.* at 675, 54 *L.Ed.*2d at 624. The effect of the statute was to prevent absolutely some persons from marrying. *Id.* at 387, 98 *S.Ct.* at 681, 54 *L.Ed.*2d at 631.

In *Zablocki,* the Court distinguished *Jobst,* observing that the social security provisions there under attack "placed no direct obstacle in the path of persons desiring to get married, and * * * there was no evidence that the laws significantly discouraged, let alone 'made practically impossible,' any marriages." *Id.* at 387 n. 12, 98 *S.Ct.* at 682 n. 12, 54 *L.Ed.*2d at 631 n. 12. However, the Court explicitly noted that, as in *Jobst,* "reasonable regulations that do not significantly interfere with the marital relationship may legitimately be imposed," and thus must satisfy only minimal judicial scrutiny. *Id.* at 386, 98 *S.Ct.* at 681, 54 *L.Ed.*2d at 631.

■ The analysis of fundamental rights under the New Jersey Constitution differs from analysis of those rights under the United States Constitution. *Right to Choose v. Byrne, supra,* 91 *N.J.* at 308–09. Starting with our decision in *Robinson v. Cahill,* 62 *N.J.* 473, 491–92, *cert. denied sub nom. Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973), we began to develop an independent analysis of rights under article 1, paragraph 1. Thereafter, we rejected two-tiered equal protection analysis, *Collingswood v. Ringgold,* 66 *N.J.* 350, 370 (1975), *appeal dismissed,* 426 *U.S.* 901, 96 *S.Ct.* 2220, 48 *L.Ed.* 2d 826 (1976), and employed a balancing test in analyzing claims under the state constitution. *Taxpayers Ass'n of Weymouth Township v. Weymouth Township,* 80 *N.J.* 6, 43 (1976). In striking the balance, we have considered the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction. *Right to Choose v. Byrne, supra,* 91 *N.J.* at 308–09; *Robinson v. Cahill, supra,* 62 *N.J.* at 491–92.

To a large extent, those considerations are implicit, if not explicit, in federal analysis of the due process and equal protection clauses. For example, in equal protection analysis, the nature of the right is the crucial consideration in characterizing a right as "fundamental," the initial step in determining whether the governmental regulation will receive "strict scrutiny" or a more relaxed standard of judicial review. *See Zablocki v. Redhail, supra,* 434 *U.S.* at 383, 98 *S.Ct.* at 679, 54 *L.Ed.*2d at 628. Similarly, the justification for a statute and the statute's effect on a private right are common to analysis of claims under the New Jersey Constitution and to federal analysis of substantive due process claims.

Our development of an independent analysis follows basically from our recognition that the two constitutions contain different texts. *Right to Choose v. Byrne, supra,* 91 *N.J.* at 300–01; *see also State v. Hunt,* 91 *N.J.* 338, 364 (1982) (Handler, J., concurring) (identifying textual language as the first of seven criteria for determining when to invoke state constitution as an

independent source of fundamental rights). From the face of the two charters, it is apparent that the New Jersey Constitution is not a mirror image of the United States Constitution. Article 1, paragraph 1 of the New Jersey Constitution, which is a grant of fundamental rights, provides:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

Nowhere in that paragraph do the phrases "equal protection" or "due process" appear. Nonetheless, article 1, paragraph 1, like the fourteenth amendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike. To this extent, article 1 safeguards values like those encompassed by the principles of due process and equal protection.

In the future, as in the past, we shall continue to look to both the federal courts and other state courts for assistance in constitutional analysis. The ultimate responsibility for interpreting the New Jersey Constitution, however, is ours. By developing an interpretation of the New Jersey Constitution that is not irrevocably bound by federal analysis, we meet that responsibility and avoid the necessity of adjusting our construction of the state constitution to accommodate every change in federal analysis of the United States Constitution.

The wisdom of that method is apparent upon considering the changing roles of due process and equal protection in federal analysis. Not only has the United States Supreme Court alternated between the due process and equal protection clauses over the past fifty years, but in some cases it has become entangled in their separate strands. For example, in *Zablocki*, Justice Marshall, joined by Chief Justice Burger and Justices Brennan, White and Blackmun, held to be violative of the equal protection clause a Wisconsin statute forbidding a Wisconsin resident in default of a support order from marrying without first obtaining court approval. Although he did not agree with

the majority's equal protection formulation, Justice Stevens agreed that equal protection provided the appropriate method of analysis. 434 *U.S.* at 403, 98 *S.Ct.* at 690, 54 *L.Ed.*2d at 641. Justice Stewart found the statute invalid as a matter of due process, and wrote in a concurring opinion that the majority's equal protection test "is no more than substantive due process by another name." 434 *U.S.* at 395, 98 *S.Ct.* at 686, 54 *L.Ed.*2d at 636. Justice Powell found that "[t]he Wisconsin measure in this case does not pass muster under either due process or equal protection standards." 434 *U.S.* at 400, 98 *S.Ct.* at 688, 54 *L.Ed.*2d at 640. By contrast, Justice Rehnquist found that the statute satisfied the requirements of both the equal protection and due process clauses of the fourteenth amendment. 434 *U.S.* at 407–11, 98 *S.Ct.* at 692–94, 54 *L.Ed.*2d at 644–47. See also *Cleveland Bd. of Educ. v. Lafleur, supra,* 414 *U.S.* 632, 94 *S.Ct.* 791, 39 *L.Ed.*2d 52 (majority comprised of Justice Stewart, joined by Justices Brennan, White, Marshall, and Blackmun, invalidated school board rules as a violation of due process; Justice Douglas concurred in the result; on equal protection grounds, Justice Powell concurred, and Justice Rehnquist, joined by Chief Justice Burger, dissented); *Williams v. Illinois,* 399 *U.S.* 235, 259, 90 *S.Ct.* 2018, 2031, 26 *L.Ed.*2d 586, 603 (1970) (Harlan, J., concurring) (relies on due process analysis and characterizes majority's reliance on equal protection clause as a "wolf in sheep's clothing"). As the preceding discussion illustrates, due process and equal protection analyses, while proceeding along parallel lines, may overlap, or at least so it may seem. *Right to Choose v. Byrne, supra,* 91 *N.J.* at 310 n. 8.

In some cases our analysis of article 1, paragraph 1 of the New Jersey Constitution may lead to a different result from that required by the fourteenth amendment to the United States Constitution. In this case, however, the two constitutions point toward the same result.

## IV

We turn now to an analysis of the rights implicated in plaintiff's claims: the right to employment opportunity, the right to marry, and the right to familial association. Although not expressly found in the text of either the United States or the New Jersey Constitutions, these rights are a vital part of life in a free society. *See Loving v. Virginia, supra,* 388 *U.S.* at 12, 87 *S.Ct.* at 1823, 18 *L.Ed.*2d at 1018.

Plaintiff's core claim is that she has a right to work in a casino that is protected by the fourteenth amendment and by article 1, paragraph 1 of the New Jersey Constitution. The right to employment opportunity, although not a fundamental right, remains a fourteenth amendment liberty interest that is protected against arbitrary governmental interference. *Hampton v. Mow Sun Wong,* 426 *U.S.* 88, 102–03, 96 *S.Ct.* 1895, 1904–05, 48 *L.Ed.*2d 495 (1976) (Civil Service Commission rule excluding aliens from employment in "major sector of the economy arbitrarily violates due process liberty interest"); *Schware v. Board of Bar Examiners,* 353 *U.S.* 232, 238–39, 77 *S.Ct.* 752, 755–56, 1 *L.Ed.*2d 796, 801–02 (1957) (arbitrary denial of admission to the bar violates due process liberty interest); *Truax v. Raich,* 239 *U.S.* 33, 40–42, 36 *S.Ct.* 7, 10–11, 60 *L.Ed.* 131, 135 (1915) (state penal law excluding aliens from employment by restricting jobs to qualified electors or native born citizens violates equal protection right to employment opportunity).

Whether it is characterized as a liberty interest or a property right, the right to employment opportunity is also protected under the New Jersey Constitution. *Cameron v. International Alliance of Theatrical Stage Employees,* 118 *N.J.Eq.* 11, 22–23 (E. & A. 1935); *see Lane Distribs., Inc. v. Tilton,* 7 *N.J.* 349, 362 (1951); *Kravis v. Hock,* 136 *N.J.L.* 161, 164 (E. & A. 1947). The protectible interest stems from the substantive due process notions implicit in article 1, paragraph 1 of the New Jersey Constitution. *Ballou v. State of New Jersey,* 148 *N.J.*

*Super.* 112, 121 (App.Div.1977), *aff'd*, 75 *N.J.* 365 (1978); *Hutton Park Gardens v. West Orange Town Council*, 68 *N.J.* 543, 560 (1975). Notwithstanding that protection, the right to employment opportunity is subject to reasonable measures to promote the general welfare under both the federal constitution, *Schware v. Board of Bar Examiners, supra,* 353 *U.S.* at 238–39, 77 *S.Ct.* at 755–56, 1 *L.Ed.*2d at 801–02, and the New Jersey Constitution, *In re Polk,* 90 *N.J.* 550, 562–63 (1982).

As with the right to employment opportunity, the right to marry, the right to familial association, and the right to privacy do not have a textual basis in the federal constitution. At one time the right to marry was regarded as a liberty interest inherent in the due process clause of the fourteenth amendment. *See Meyer v. Nebraska,* 262 *U.S.* 390, 399, 43 *S.Ct.* 625, 626, 67 *L.Ed.* 1042, 1045 (1923). Thereafter, when substantive due process fell into disuse, the right was recognized as a value inherent in the first, third, fourth, fifth, and ninth amendments to the United States Constitution, *Griswold v. Connecticut, supra,* 381 *U.S.* at 484–85, 85 *S.Ct.* at 1681–82, 14 *L.Ed.*2d at 514–15, and as a protectible interest under the equal protection clause, *Skinner v. Oklahoma,* 316 *U.S.* 535, 62 *S.Ct.* 1110, 86 *L.Ed.* 1655 (1942). More recently, the rights to marry and to familial association, like the right to privacy from which they derive, have been attributed again to the due process clause. *Cleveland Bd. of Educ. v. Lafleur, supra,* 414 *U.S.* at 639, 94 *S.Ct.* at 796, 39 *L.Ed.*2d at 60; *Roe v. Wade, supra,* 410 *U.S.* at 153, 93 *S.Ct.* at 727, 35 *L.Ed.*2d at 177. *See generally Zablocki v. Redhail, supra,* 434 *U.S.* at 383–86, 98 *S.Ct.* at 679–81, 54 *L.Ed.*2d at 628–30 (reviewing decisions on the right to marry).

Like its federal counterpart, the New Jersey Constitution does not expressly recognize a right to marry, a right of familial association, or a right to privacy. Previously, however, we have found a right to privacy implicit in article 1, paragraph 1 of the state constitution. That right embraces the right to make procreative decisions, *Right to Choose v. Byrne, supra,*

91 *N.J.* at 303–10; the right of consenting adults to engage in sexual conduct, *State v. Saunders,* 75 *N.J.* 200, 224–28 (1977) (Schreiber, J., concurring); the right to sterilization, *In re Grady,* 85 *N.J.* 235, 249 (1981); and even the right to terminate life itself, *In re Quinlan,* 70 *N.J.* 10, 40–41, 51, *cert. denied sub nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976).

As one of life's most intimate choices, the decision to marry invokes a privacy interest safeguarded by the New Jersey Constitution. Although constitutionally based, the right to marry remains subject to reasonable state regulation. Indeed, that right traditionally has been subject to pervasive regulation. For example, statutes include bans on incestuous marriages, *N.J.S.A.* 37:1–1; bigamous marriages, *N.J.S.A.* 2C:24–1; and marriages to persons adjudged to be mentally incompetent, *N.J.S.A.* 37:1–9. Similarly, we find that article 1, paragraph 1 embraces a right to familial association, albeit one that is subject to reasonable governmental regulation. Thus, the question is not whether we recognize the rights upon which plaintiff relies, but how those rights should be viewed in light of the paramount state interest in preserving the integrity of the judiciary from the potentially corrupting influence of the casino industry.

### V

In claiming that the casino ethics amendment deprives her of a fundamental right to work in a casino, plaintiff relies on the due process clause and on principles of due process inherent in article 1, paragraph 1 of the New Jersey Constitution. Due process notions are implicated also in her claim that the casino ethics amendment impinges on her rights to marry and to familial association by forcing her to choose between those rights and casino employment. She contends further that the extension of the employment restriction to the spouse of a judge denies her equal protection of the law. In this regard,

she argues that the state's interest in preventing the appearance of impropriety that would arise from her employment in a casino is not compelling. Alternatively, she asserts that even if the amendment furthers a compelling state interest, a less restrictive alternative is available: the recusal of judges from casino cases. Her final equal protection claim is that because most judicial spouses are women, the amendment discriminates against her on the basis of gender. Common to all of these contentions is the assertion that her right to work in a casino is fundamental.

Apparently the casino industry provides the most significant number of job opportunities in Atlantic County. For example, it provides approximately 15% of all non-farm job opportunities and 35% of all non-farm, non-manufacturing jobs in that county. *See State of New Jersey, Dep't of Labor & Indus., Employment and the Economy*, p. 5 (Dec.1984). Plaintiff estimates that she would receive significantly greater compensation from casino employment than from another employer. At oral argument, her counsel informed us that, over her working life, the differential could amount to one million dollars. Nonetheless, the success of plaintiff's claim to casino employment depends not so much on the availability of that employment, or its greater reward, but on the nature of her right to work in the casino industry.

The right to a particular job, unlike the right to work in general, has never been regarded as fundamental. *Great American Sav. & Loan v. Novotny*, 442 *U.S.* 366, 380–81, 99 *S.Ct.* 2345, 2353–54, 60 *L.Ed.*2d 957, 969 (1979) (Powell, J., concurring) ("[t]his Court has never held that the right to any particular private employment is a 'right of national citizenship,' or derives from any other right created by the Constitution"); *Massachusetts Bd. of Retirement v. Murgia*, 427 *U.S.* 307, 313, 96 *S.Ct.* 2562, 2567, 49 *L.Ed.*2d 520, 524 (1976) ("we have expressly stated that a standard less than strict scrutiny 'has consistently been applied to state legislation

restricting the availability of employment opportunities' "); *accord Barsky v. Board of Regents of N.Y.*, 347 *U.S.* 442, 472–73, 74 *S.Ct.* 650, 666–67, 98 *L.Ed.* 829, 850 (1954) (Douglas, J., dissenting) ("a man has no affirmative right to any particular job or skill or occupation"). Hence, we do not view plaintiff's desire to work in a casino as implicating a fundamental right.

■ From that perspective, our task is to discern whether a rational basis supports the ban on the employment of judicial spouses in casinos. That the statute is supported by such a basis is manifested by the state interest in preserving the integrity of the judiciary and confidence in the casino industry. The acknowledged vulnerability of that industry to organized crime magnifies the importance of maintaining public trust in the integrity of the regulatory and judicial processes. A public perception that any improper influence has infiltrated those processes, however slightly, would undermine the trust that is essential to continued confidence in the industry and, what is more important, in state government. Consequently, plaintiff's due process attack on the amendment must fail.

Even if plaintiff were deemed to enjoy a fundamental right to work in a casino, the restriction would be valid. No less restrictive measure could achieve the legislative purpose of placing the impartiality of judges and other state officers beyond suspicion. *See Shelton v. Tucker*, 364 *U.S.* 479, 488, 81 *S.Ct.* 247, 252, 5 *L.Ed.*2d 231, 237 (1960). In an area so close to the heart of government, protection of the public interest is not met by mandatory recusal of a judge from casino cases. If Mrs. Greenberg could work in a casino, so could the spouses and children of other judges. The recusal of all judges so affected could impose a substantial burden on the administration of justice, particularly in Atlantic County. In addition, a conflict of interest affecting one judge could be perceived as infecting other judges. Assuming, as plaintiff contends, that casinos pay more than other employers, the employment of judicial spouses could even lead the public to conclude that the

judicial system is for sale to the highest bidder, a prospect we cannot countenance. Consequently, the extension of the employment restriction to judicial spouses rests on a rational basis. Perhaps a less restrictive alternative would suffice, but in the absence of a fundamental right, it is not incumbent upon the Legislature to act in such a manner. *See San Antonio School Dist. v. Rodriguez*, 411 *U.S.* 1, 51, 93 *S.Ct.* 1278, 1306, 36 *L.Ed.* 2d 16, 53 (1973).

*In re Gaulkin*, 69 *N.J.* 185 (1976), upon which plaintiff relies, supports the conclusion that the ban on casino employment should extend beyond judges to their spouses. In *Gaulkin*, although we ruled that a judicial spouse could seek election to a board of education, we observed that marital assets are normally so commingled that the use of those assets for political contributions would risk excessive judicial entanglement in politics. *Id.* at 199–200. Just as a judicial spouse's political contributions might be perceived as an indirect contribution by the judge, the salary paid by a casino to a judicial spouse might be perceived as an indirect payment to the judge.

In a modern marriage, both a wife and a husband enjoy equivalent rights to pursue careers. Both spouses frequently contribute to the family fisc. Although a wife may pursue a career of her own, in the eyes of the world, she and her husband comprise a single economic entity. Their marriage takes them beyond independence to interdependence, to a mutual sharing of aspirations, earnings, and assets. Normally a husband and wife do not distinguish between their earnings and financial obligations on the basis of who produced the income or incurred the debt. *See Jersey Shore v. Estate of Baum*, 84 *N.J.* 137, 149 (1980). Precisely how a husband and wife share their earnings and assets may vary from one married couple to another, but the shared interest remains. Consequently, the Legislature could reasonably conclude that a judicial spouse's earnings from casino employment would redound to the benefit of the judge, or at least that it might so appear. *See Kenny v.*

*Byrne,* 144 *N.J.Super.* 243, 256 (App.Div.1976), *aff'd,* 75 *N.J.* 458 (1978).

The United States Supreme Court also has upheld legislative classifications predicated on the assumption that spouses commingle their resources. *Califano v. Jobst, supra,* 434 *U.S.* at 53–54, 98 *S.Ct.* at 99–100, 54 *L.Ed.*2d at 234–35 (upholding as rational a provision in the Social Security Act that benefits of a dependent disabled child would terminate on marriage to another disabled person not eligible for benefits); *see also Califano v. Boles,* 443 *U.S.* 282, 289, 99 *S.Ct.* 2767, 2772, 61 *L.Ed.*2d 541, 548 (1979) (the denial of disability insurance benefits to mothers who never married the deceased wage earner bears a rational relation to easing the burden on a spouse caused by the wage earner's death). In extending the restriction against casino employment beyond judges to their spouses, the legislative classification reflects the reasonable conclusion that spouses ordinarily commingle their assets.

We reach the same result under the New Jersey Constitution. Although plaintiff's right to employment opportunity is important, she does not enjoy a constitutional right to work in a casino. The state interest in preserving the integrity of the judiciary outweighs her interest in unrestricted employment opportunities. She remains free to pursue her vocation in Atlantic City or elsewhere with other employers. Precluding plaintiff from a more lucrative position with a casino, although it might significantly reduce her earnings, is a small price to pay for preserving public confidence in the integrity of the judicial system. Thus, we find the statute to be valid under the state constitution.

We are likewise unpersuaded by plaintiff's additional equal protection claim that the casino ethics amendment is arbitrary because it is under-inclusive. She challenges the statutory classifications because they do not extend (1) to state officials whose family members do not reside in the same household, *N.J.S.A.* 52:13D–13(i); (2) to persons who live with,

but are not married to a public official or judge, or (3) to persons not directly employed by a casino who become the spouse of an already appointed state officer or employee who does not have responsibility for matters affecting casino affairs, *N.J.S.A.* 52:13D–17.2d (hereinafter the "Love Bill"). Because no fundamental right or suspect class is involved, the classifications would be invalid under the federal constitution only if they manifest "arbitrary discrimination between persons similarly situated." *Minnesota v. Clover Leaf Creamery Co., supra,* 449 *U.S.* at 461–66, 101 *S.Ct.* at 722–25, 66 *L.Ed.*2d at 667–69.

Applying this standard, we find to be rational the legislative decision not to extend the restriction to a parent, child, or sibling who does not share the same household with a state official. *N.J.S.A.* 52:13D–13(i). The Legislature could reasonably conclude that family members who live together, unlike those who live apart, share economic interests. That the restriction stops short of unmarried persons living with a judge or other state official is likewise rational. The Legislature could rationally distinguish between married and unmarried persons on the ground that marriage is a reliable indicator of shared economic interests. Conversely, the Legislature could have concluded that unmarried persons who reside together are more likely to retain their economic and social independence. Although it is arguable that the ban should extend to unmarried persons who live together, the Legislature may address the problem one step at a time. *Williamson v. Lee Optical of Okla., supra,* 348 *U.S.* at 489, 75 *S.Ct.* at 465, 99 *L.Ed.* at 573. Proper classification for equal protection purposes is not a precise science. With the passage of time and the acquisition of further experience, the Legislature may want to reconsider statutory classifications or restrictions. As long as the classifications do not discriminate arbitrarily between persons who are similarly situated, the matter is one of legislative prerogative.

Somewhat more difficult to justify is the exception created by the "Love Bill," which allows spouses of state officials not directly responsible for casino regulation to be indirectly employed by casinos. Possibly the Legislature concluded that persons who are indirectly employed by a casino are not as dependent on the casino as those for whom the casino is the sole source of employment. Their diluted dependence diminishes the possibility of a conflict of interest. It is not for us to say whether the "Love Bill" was wise. Our task is confined to ascertaining whether it has a conceivable rational basis. From that perspective, the exception is constitutional.

We turn now to plaintiff's claim that the casino ethics amendment unconstitutionally interferes with her right to marry. The amendment, which was adopted sixteen years after her marriage, could not have affected plaintiff's decision to marry, and she does not intimate that her inability to obtain casino employment might affect her decision to remain married. Any interference with her marital rights is but an indirect consequence of the ban on the employment of judicial spouses in casinos. *See Califano v. Jobst, supra,* 434 *U.S.* at 53–54, 98 *S.Ct.* at 99–100, 54 *L.Ed.*2d at 235. We conclude that because it bears a rational relationship to its objective of preserving the public confidence in casino gambling, the casino ethics amendment is constitutional.

As with the right to marry, the state may impose reasonable restraints on activities that do not substantially intrude upon family living arrangements. *Moore v. East Cleveland, supra,* 431 *U.S.* at 499, 97 *S.Ct.* at 1935, 52 *L.Ed.*2d at 537. In *Moore,* the Court found that the effect of an East Cleveland ordinance was to prevent the family from living together and that the ordinance contributed marginally, at best, to the city's asserted interest in alleviating overcrowding. By contrast, the casino ethics amendment does not directly intrude upon plaintiff's family living arrangement. Its effect on her family life is, at most, indirect. As previously discussed, the amendment serves

the state interest in avoiding the appearance of impropriety in the casino industry. Thus, under federal law, the amendment is reasonable and does not violate plaintiff's right to familial association.

Insofar as her challenge to the statute is predicated upon the state constitution, we consider the effect of the statute upon plaintiff's asserted rights to marry and to familial association in light of the state interest in maintaining confidence in the integrity of the judiciary. As indicated, we find that the state interest outweighs the slight imposition upon plaintiff's rights.

▇▇▇ Plaintiff's final equal protection challenge arises from the fact that approximately 95% of New Jersey judges are men, which leads her to conclude that the casino ethics amendment impacts disproportionately upon spouses who are women. To support her claims, she refers to *N.J.S.A.* 52:13D–17.2a, which defines the word "person" so that casino employment restrictions apply to all full-time members of the judiciary whether or not they hear casino cases, but only to those state officials who are vested "with responsibility for matters affecting casino activity." She contends that the spouse of a judge should be precluded from casino employment only if the judge, like other state officers, is responsible for casino matters. Another section of the casino ethics amendment, *N.J.S.A.* 52:13D–17.2b, makes clear, however, that the restriction applies to all state officers. *N.J.S.A.* 52:13D–17.2b states that "[n]o state officer or employee, nor any persons, nor any member of the immediate family of any state officer or employee * * * shall hold employment with * * * any holder of, or applicant for, a casino license * * *." As the trial court found, the state employs slightly more women than men. Because the relevant class is comprised of all state employees, not just those who are full-time judges, the challenged restriction does not impact any more heavily upon spouses who are women than on those who are men. Thus, the equal protection claim is without merit.

▇▇▇ Even if we were to limit our focus to the effect of the Conflicts of Interest Law on judges, the claim would fail.

Because the statute does not facially distinguish between sexes, an equal protection claim could succeed only if the statute had an invidious purpose. *Massachusetts v. Feeney*, 442 *U.S.* 256, 274–75, 99 *S.Ct.* 2282, 2293–94, 60 *L.Ed.*2d 870, 884–85 (1979) (despite disproportionate impact on women, facially gender-neutral statute, giving preference to veterans for public employment, does not violate equal protection absent showing of discriminatory legislative purpose); *Washington v. Davis*, 426 *U.S.* 229, 241–42, 96 *S.Ct.* 2040, 2048–49, 48 *L.Ed.*2d 597, 608–09 (1976) (requirement that prospective police recruits take written exam, which affects blacks four times more heavily than whites, does not violate equal protection absent invidious discriminatory purpose); *Geduldig v. Aiello*, 417 *U.S.* 484, 496–97, 94 *S.Ct.* 2485, 2491–92, 41 *L.Ed.*2d 256 (1974) (facially neutral disability insurance system conferring same benefits on men and women, but that excludes pregnancy as a compensable disability, does not violate equal protection absent showing that pregnancy distinction is a mere pretext "designed to effect an invidious discrimination against members of one sex or another"). Plaintiff has not demonstrated that the Legislature intended to discriminate against women in the casino ethics amendment, and we are unaware of any facts that would support that hypothesis. Hence, the test of the amendment's constitutionality is whether it has a rational relationship to a legitimate state purpose. *Massachusetts v. Feeney, supra*, 442 *U.S.* at 275, 99 *S.Ct.* at 2294, 60 *L.Ed.*2d at 885; *Washington v. Davis, supra*, 426 *U.S.* at 246, 96 *S.Ct.* at 2050, 48 *L.Ed.*2d at 611. Similarly, plaintiff does not raise a colorable claim of facial or intended discrimination under article 1, paragraph 1 of the New Jersey Constitution.

The judgment of the Appellate Division is affirmed.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For reversal* —None.