**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1030-13T2

STATE OF NEW JERSEY
IN THE INTEREST OF
Y.C.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| June 5, 2014 |
| APPELLATE DIVISION |

Argued May 13, 2014 — Decided June 5, 2014

Before Judges Reisner, Ostrer and Carroll.

On appeal from the State of New Jersey, New Jersey Juvenile Justice Commission and Department of Corrections.

Laura Cohen argued the cause for appellant Y.C. (Rutgers Criminal and Youth Justice Clinic, attorneys; Ms. Cohen, on the brief).

Joseph M. Micheletti, Deputy Attorney General, argued the cause for respondent New Jersey Juvenile Justice Commission and Department of Corrections (John J. Hoffman, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Alex J. Zowin, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

REISNER, P.J.A.D.

This case is a sequel to State of New Jersey in the Interest of J.J., 427 N.J. Super. 541 (App. Div. 2012), in which we invalidated the Juvenile Justice Commission's then-existing

regulations for transferring juveniles to adult facilities run by the Department of Corrections (DOC), and directed the agency to adopt new regulations. Id. at 558; see N.J.A.C. 13:91-2.1. In this appeal, Y.C., who was adjudicated delinquent as a juvenile and sentenced to the custody of the Juvenile Justice Commission (JJC or agency) for a term of six years, challenges a determination of the JJC transferring him to an adult prison.[1] We conclude that the agency's adoption of an "interim policy" on transfers did not comply with our direction in J.J., or with the Administrative Procedures Act (APA), N.J.S.A. 52:14B-4. See N.J.S.A. 52:14B-4(d) ("No rule hereafter adopted is valid unless adopted in substantial compliance" with the APA). We remand this matter to the JJC for a new transfer hearing, which shall be held before the Office of Administrative Law (OAL) on an expedited basis. We also direct the agency to adopt new regulations within 180 days.

I

By way of background, in 1995, the Legislature authorized the JJC to transfer to adult prisons certain juveniles who met criteria set forth in the statute:

> The commission and the Commissioner of the
> Department of Corrections shall, consistent
> with applicable State and federal standards,

_____

[1] On October 29, 2013, we denied a stay of the transfer but accelerated this appeal.

formulate a plan setting forth procedures for transferring custody of any juvenile incarcerated in a juvenile facility who has reached the age of 16 during confinement and whose continued presence in the juvenile facility threatens the public safety, the safety of juvenile offenders, or the ability of the commission to operate the program in the manner intended.

[N.J.S.A. 52:17B-175(e) (emphasis added).]

The Legislature further directed the JJC and the DOC to "jointly adopt regulations pursuant to the [APA], establishing the procedures included in the plan." Ibid.

As we noted in J.J., the agencies adopted regulations, N.J.A.C. 13:91-2.1, that provided no procedural due process for a juvenile facing transfer. The State contended that none was required. J.J., supra, 427 N.J. Super. at 543. We disagreed, finding that the regulation was invalid:

Because N.J.A.C. 13:91-2.1 provides no due process rights to the juvenile as part of the transfer process, we hold that it is invalid. It does not comply with the statutory requirement that the transfer procedures be "consistent with applicable state and federal standards," particularly the juvenile's rights to due process. U.S. Const. amend. XIV; see Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985) (Article I, Paragraph 1 of the New Jersey Constitution "safeguards values like those encompassed by the principles of due process and equal protection.").

[Id. at 558.]

We rejected J.J.'s alternate arguments that the transfer decision should be made by a Family Part judge, and that he could not be transferred to an adult prison unless he had a right to a jury trial in the delinquency adjudication. Id. at 553, 557. However, we concluded that, "[a]t a minimum," the JJC must provide a juvenile with the following due process protections:

> [B]efore a juvenile can be transferred to custody of the DOC, there must be written notice of the proposed transfer and the supporting factual basis, an impartial decision maker, an opportunity to be heard and to present opposition, some form of representation, and written findings of fact supporting a decision to proceed with the transfer.
>
> [Id. at 557 (footnote omitted).]

We did not decide whether a juvenile was entitled to representation by counsel, because the record was inadequate to permit us to address the issue:

> The record does not reflect whether legal assistance similar to "counsel substitutes" or some other form of legal assistance is available in juvenile facilities to assist juveniles in opposing a transfer request. In addition, it is not clear whether transferred juveniles are mixed with the adult population when they are transferred or segregated from adult offenders albeit housed in an adult prison, nor does the record reflect whether or not they continue to receive rehabilitative and other services available to juveniles at JJC facilities. Those factors would inform our consideration

A-1030-13T2

of whether there must be representation by counsel.

[Id. at 557 n.7.]

We ordered that the juvenile be returned to the JJC's custody, and ordered the JJC to revise its regulations before seeking to re-transfer the juvenile to DOC custody:

> For the reasons set forth above, we reverse the order transferring [J.J.] to the custody of the DOC and order his return to the custody of the JJC. The JJC shall promptly revise its regulations to provide an appropriate level of due process consistent with this opinion. It may then seek to transfer Jones to the custody of the DOC with an appropriate hearing and procedural safeguards.

[Id. at 558 (emphasis added).]

In our view, the above language was unambiguous and unequivocal. The JJC needed to adopt revised regulations before seeking to transfer juveniles to DOC custody. But that did not happen. Instead, on August 1, 2013, the JJC adopted Policy Number 13ED:01.30, entitled "Transfers of Juveniles to DOC — Interim Policy." The interim policy, under which the JJC continues to operate, was not promulgated in conformity with the procedures required by the APA. See N.J.S.A. 52:14B-4. Almost

two years after J.J. was decided, the agency still has not adopted regulations.[2]

Meanwhile, on October 18, 2013, more than a year after J.J. was decided, the JJC transferred Y.C. to an adult prison. Pursuant to the interim policy, he received a hearing before a JJC hearing officer, but he was denied the opportunity to be represented by counsel, even though he had an attorney who sought permission to appear. The attorney was permitted to file a brief on Y.C.'s behalf, but was not allowed to be present at the hearing. Instead, as provided by the interim policy, Y.C. was represented at the hearing by a non-attorney, the JJC Ombudsman, an individual whom the policy describes as "the individual(s) within the Commission responsible for resolving complaints made by juveniles about the facility, the action or inaction of staff or any other matter of concern to the juvenile." According to Y.C., he had no opportunity to introduce educational and other records designed to show his positive progress while in JJC custody; only his disciplinary records and the JJC's institutional notes were introduced. Further, he contends that the Ombudsman failed to present or cross-examine any witnesses or otherwise act as an independent and zealous advocate.

---

[2] The agency proposed new regulations on August 19, 2013, 45 N.J.R. 1941(a), but has not adopted them.

The JJC hearing officer determined that Y.C. should be transferred to DOC custody because he had incurred forty-five disciplinary charges in the past year, and he belonged to a "security threat group." The prior charges included fighting, attempted or aiding an assault on another juvenile, and throwing bodily fluids. Y.C. contended that he was making efforts to improve his behavior and had not incurred any disciplinary infractions for the past four months preceding the hearing. The hearing officer found that due to Y.C.'s disruptive conduct, "his continued presence in the juvenile facility threatened the safety" of the JJC staff and other juvenile residents. The hearing officer also found that Y.C.'s behavior "undermined JJC's ability to operate the juvenile facility in a stable, safe and orderly manner," and his involvement in numerous serious disciplinary infractions "impede[d] the effective delivery of services because of his constant non-compliant behavior."

The record of this appeal does not provide the information that, in J.J., we found necessary to decide whether juveniles must have the right to counsel in transfer hearings. Moreover, there is no transcript or other contemporaneous record of what

occurred at the hearing, beyond a handwritten form and a short supplemental decision from the hearing officer.[3]

II

On this appeal, Y.C. raises a plethora of issues in multiple points and subpoints. Y.C. contends that the Ombudsman, who was a JJC employee and not an attorney, was not an appropriate representative. Analogizing to a case dealing with transfers to mental health facilities, <u>Vitek v. Jones</u>, 445 <u>U.S.</u> 480, 494-95, 100 <u>S. Ct.</u> 1254, 1264-65, 63 <u>L. Ed.</u> 2d 552, 566 (1980), Y.C. argues he was entitled to representation by counsel. He also argues that the JJC hearing officer was not an impartial decision-maker. <u>See</u> <u>N.J.A.C.</u> 13:101-1.3 (disciplinary hearing officer is a JJC staff member). He further contends that a juvenile court judge must make the transfer decision, an

---

[3] After this appeal was filed, Y.C. filed a motion to supplement the record, largely aimed at documenting positive aspects of his behavior at the JJC facility. We denied the motion. However, we note that his motion included a certification attesting that since his transfer to the DOC, he was being held in administrative segregation with an adult roommate, and was not being provided with educational or other services similar to those available at the JJC. The JJC filed a certification attesting that DOC inmates under age twenty-one are provided with educational opportunities and other services, but stating no facts pertaining specifically to Y.C. At most, the certifications created material disputes of fact about the conditions afforded juvenile transferees in the adult prison system.

argument we previously rejected. J.J., supra, 427 N.J. Super. at 557.

Y.C. contends that the interim policy is invalid because it was not adopted as a regulation. He argues that he could not be transferred in the absence of the regulations we directed be adopted in J.J. He also argues that, before he pled guilty in juvenile court, he had a right to notice that he might eventually be transferred to an adult prison. He contends the JJC did not notify him, at the time he entered JJC custody, that he could be transferred to adult prison as a disciplinary consequence of violating institutional rules.

Y.C. argues that the interim policy unduly limits the juvenile's right to present evidence and call witnesses at the hearing, and does not clearly define what issues the juvenile is required to address. He also contends that, without access to his own institutional records, the right to present evidence at a transfer hearing is meaningless. In a related argument, he claims that the JJC's failure to consider a juvenile's entire record is improper. And, he claims the proposed regulations go further than the statute in setting forth grounds for a possible transfer. He argues that a threat to security should be the only acceptable grounds for a transfer. He asserts that the applicable proof standard for a transfer should be "clear and convincing" not "substantial credible evidence." He further

contends that a transcript or electronic recording of the hearing should be required, and that the hearing officer's written statement of reasons was inadequate. Finally, he argues that if he can be incarcerated in adult prison, he was entitled to a jury trial before being adjudicated delinquent, an argument we rejected in J.J.

In its response, the JJC emphasizes that Y.C. is nineteen years old, six feet tall, weighs 190 pounds, is a member of a security threat group, and was adjudicated delinquent for crimes that if committed by an adult would have constituted first-degree armed robbery. The JJC claims Y.C. is violent and has assaulted other juveniles while at the New Jersey Training School at Jamesburg and the Juvenile Medium Security Facility at Bordentown. The JJC also contends that the procedures set forth in the interim policy were consistent with what J.J. required, and Y.C. was not entitled to any further due process.

### III

We decline to decide the bulk of the issues Y.C. raises on this appeal, because of the lack of an adequate factual record. Moreover, many of the procedural issues he raises are addressed by the remedy we order here, i.e., an OAL hearing at which he will be represented by counsel. We also note that some of the issues J.J. raises here may not be appropriate for decision in the context of a disciplinary/transfer case.

A-1030-13T2

For example, Y.C.'s argument that juveniles are entitled to jury trials, may be more appropriately raised in the context of an appeal in which a juvenile has requested a jury trial and the request has been denied. See, e.g., State ex rel. A.C., 424 N.J. Super. 252, 253 (App. Div. 2012); but see In re C.B., 708 So. 2d 391, 400 (La. 1998) (in the absence of the right to a jury trial, a statute providing for the automatic transfer of seventeen-year-old juveniles to adult prisons was unconstitutional); Monroe v. Soliz, 939 P.2d 205, 208 (Wash. 1997) (finding that juvenile transfer statute did not implicate the jury trial right, but juveniles were entitled to due process prior to transfer). In this case, Y.C. did not request a jury trial in juvenile court, and he pled guilty. Likewise, he is not seeking to withdraw his guilty plea and, hence, this case may not be an appropriate vehicle to decide whether he should have been notified, prior to his plea, that he could at some point be transferred to an adult prison. See, e.g., State v. Bellamy, 178 N.J. 127, 138-40 (2003). Further, even if we were inclined to reconsider issues already decided in J.J., we would not do so on this record.

We lack an adequate factual record to consider Y.C.'s challenge to the substance of the interim policy, and a challenge to the agency's regulations, which have thus far only been proposed, must wait until the regulations are adopted. In

11

ordering the agency to adopt regulations within 180 days, we contemplate that, within a reasonable time, there will be a vehicle for an appropriate challenge and a record on which to raise many of the issues that we are not deciding in this appeal.

We do, however, have no hesitation in concluding that the agency violated the APA in adopting the interim policy. The policy is, in essence, a set of regulations promulgated without following the required APA procedures set forth in N.J.S.A. 52:14B-4. If the JJC believed it had an emergent need to transfer juveniles to adult facilities, it should have adopted emergency regulations, because J.J. required that it adopt regulations before conducting transfers. See N.J.S.A. 52:14B-4(c) (adoption of emergency regulations); Cnty. of Hudson v. Dep't of Corr., 152 N.J. 60, 73 (1997).

With respect to a remedy in this case, we acknowledge that transferring adjudicated juveniles to adult prisons implicates multiple significant issues that cannot be decided without an appropriate record. For example, we have held that juveniles are not entitled to jury trials in juvenile court, partly because the goals of the juvenile justice system are primarily rehabilitative, as opposed to punitive as in the adult criminal justice system, and the consequences of an adjudication of delinquency do not include a prison sentence. See A.C., supra,

424 <u>N.J. Super.</u> at 255, <u>aff'q</u> 426 <u>N.J. Super.</u> 81 (Ch. Div. 2011). Additionally, as Y.C.'s counsel points out, when a juvenile decides to plead guilty in juvenile court, he or she is not notified beforehand that the plea may ultimately result in a transfer to an adult prison.

On this appeal, Y.C. characterizes his transfer as a massive shift in the conditions of his confinement, and a near-complete deprivation of the rehabilitation opportunities he had at the JJC. The JJC asserts that the transfer constitutes a mere change of "location and housing" which implicates no significant due process concerns. Both sides offer representations rather than record evidence in support of their arguments.

As we noted in <u>J.J.</u>, a definitive decision on what process is due a juvenile before the JJC makes a transfer determination may depend on the conditions in which transferred juveniles are confined after transfer and the services made available to them. <u>J.J.</u>, <u>supra</u>, 427 <u>N.J. Super.</u> at 557 n.7. Those important considerations include whether transferred juveniles are housed with adult-sentenced inmates; whether the juveniles receive similar rehabilitative services in prison as would be available in a JJC facility; and whether transfers are treated as permanent, or whether they are treated as temporary and subject to periodic review, with transfer back to the JJC being an

option if the juvenile's behavior improves. See Monroe, supra, 939 P.2d at 209 (noting that Washington State regulations permit transfer back to a juvenile facility).

In this case, the JJC acted in derogation of our J.J. decision directing the agency to adopt new regulations before transferring juveniles to adult prisons. Instead, the agency promulgated a set of interim policies that were not adopted as regulations and do not satisfy the APA. Although the JJC eventually proposed new regulations, they still have not been adopted.[4] As a result, the JJC has not created any factual record (e.g., through public comments and the agency's responses to those comments) to justify the agency's procedures or permit us to evaluate whether they pass statutory or constitutional muster.[5]

---

[4] At oral argument, the JJC's counsel advised us that the agency had decided to make changes to the regulations it originally proposed and would need to re-propose the regulations with the changes. Hence, it is premature for us to opine on the standards set forth in the regulations as originally proposed, since those evidently will not be the rules the agency finally adopts.

[5] We do not rule out the possibility that a challenge to the regulations, when they are finally adopted, could require a referral to a trial court to make a complete factual record. See R. 2:5-5(b); J.B. v. N.J. State Parole Bd., 433 N.J. Super. 327, 330-31 (App. Div. 2013), certif. denied, ___ N.J. ___ (2014). We note, for example, that Wilkinson v. Austin, 545 U.S. 209, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005), concerning the due process protections required before an inmate can be transferred to a "Supermax" facility, was based on a record
(continued)

14                                                          A-1030-13T2

The hearing process conducted by the JJC in this case provided an inadequate record on which to decide the serious issues Y.C. seeks to present on this appeal. The hearing officer was a JJC employee and thus not a neutral decision-maker. Although Y.C. had an attorney ready, willing and able to represent him, he was instead represented by the JJC Ombudsman, who was not an attorney and was not independent of the JJC. And the proceeding was not recorded. Thus, even if we remanded for a rehearing before the JJC, its current hearing procedures would be insufficient to produce a record appropriate for the decision of novel legal issues. As we noted in J.J., those issues include whether a juvenile has a due process right to be represented by counsel at a transfer hearing. J.J., supra, 427 N.J. Super. at 557 n.7. Because Y.C. has already been transferred to an adult prison, his case will illustrate what happens to transferred juveniles in practice, as opposed to in theory. But, as noted, we have no confidence that such a record can be made using the JJC's in-house hearing procedures.

For all of those reasons, we order that the hearing on remand be conducted by the Office of Administrative Law rather

---

(continued)
created at "an 8-day trial with extensive evidence, including testimony from expert witnesses . . . ." Id. at 218, 125 S. Ct. at 2391, 162 L. Ed. 2d at 187.

A-1030-13T2

than by a JJC hearing officer.[6]  At that hearing, Y.C. shall have the right to be represented by counsel.  Both sides shall have the right to present evidence on these issues:  the reasons why Y.C. should or should not have been transferred to an adult prison, consistent with the standards set forth in the juvenile transfer statute, N.J.S.A. 52:17B-175(e); Y.C.'s current conditions of confinement, including whether he is being housed with adult-convicted inmates and whether he is being provided with rehabilitative services comparable to those he would receive in a JJC facility; and whether, given his history of conduct at the adult prison, it may be appropriate to transfer him back to a JJC facility, even if his initial transfer to an adult prison was justified.  Because this is, to some extent, a

---

[6] We find no statutory impediment to the OAL hearing such a case. As an agency "in, but not of" the Department of Law and Public Safety, N.J.S.A. 52:17B-170, the JJC falls within the definition of "State agency" contained in the Administrative Procedures Act.  N.J.S.A. 52:14B-2.  Moreover, even an agency whose hearings ordinarily are not heard before the OAL may make a "specific request" that an administrative law judge (ALJ) be assigned to hear one or more of its contested cases.  N.J.S.A. 52:14F-8(a).  Those agencies include, for example, the Parole Board.  Ibid.  Hence, there is authority for an ALJ to hear cases that ordinarily would be heard by the agency itself, as well as cases that involve a prison inmate or adjudicated juvenile, whose hearing may require special security measures. See also J.E. ex rel. G.E. v. State, 131 N.J. 552, 561-62 (1993) (Division of Developmental Disabilities decision to transfer developmentally disabled individual to new residence); N.J. Div. of Youth & Family Servs. v. M.R., 314 N.J. Super. 390, 412-13 (App. Div. 1998) (Division of Youth and Family Services determination of abuse and neglect).

test case, the ALJ should err on the side of allowing both sides to present as complete a record as possible. See In re Carberry, 114 N.J. 574, 588 (1989) (noting the importance of a complete factual record when a case raises a potential constitutional issue).

As with other administrative hearing matters, the assigned administrative law judge will issue an initial decision, which the agency head may then adopt, reject or modify. See N.J.S.A. 52:14B-10(c). Consistent with N.J.S.A. 52:17B-175(a), the Department of Corrections shall provide security during the OAL hearing, at whatever facility is deemed appropriate after consultation with the OAL. We direct that the proceedings on remand be completed within ninety days, unless Y.C. consents to an extension of time.[7] Because the appropriate proof standard may be an issue on any further appeal, we direct that the ALJ make alternative findings as to whether the JJC proved its case by clear and convincing evidence and, if not, whether the agency proved its case by a preponderance of the evidence.

---

[7] Out of deference to the agency's security concerns and based on our review of the evidence presented thus far, we are not ordering that Y.C. be immediately returned to a JJC facility. Therefore, the proceedings on remand should be conducted expeditiously. However, we do not want Y.C. to be precluded by time constraints from presenting a complete defense and making a complete record.

We direct the JJC to adopt regulations within 180 days. Until the JJC adopts regulations, the JJC may not transfer any adjudicated juvenile from JJC custody to an adult prison without an OAL hearing at which the juvenile has the right to be represented by counsel. In response to our inquiry at oral argument, the JJC's attorney advised us that these types of transfers are uncommon and that approximately five juveniles are transferred from JJC custody to adult prisons annually. Therefore, we anticipate that the interim requirements we impose in this opinion will not be unduly burdensome or a disruption to the JJC's mission.[8]

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8] To address a concern expressed by the JJC at oral argument, we emphasize that this opinion is limited to transfers of adjudicated juveniles from JJC custody to adult prisons. It does not apply to adult inmate disciplinary hearings conducted by the Department of Corrections, transfers of adult-convicted inmates between DOC facilities, transfers of juveniles from one JJC facility to another, or routine JJC disciplinary proceedings which do not concern transferring a juvenile to an adult facility.