643 A.2d 538

STATE OF NEW JERSEY IN THE INTEREST OF J.L.A.

Argued November 30, 1993—Decided June 29, 1994.

*Edward F. Borden, Jr.*, Camden County Prosecutor, argued the cause for appellant, State of New Jersey (*Mr. Borden*, attorney; *Norma R. Evans* and *Kathleen M. Delaney*, Assistant Prosecutors, of counsel and on the briefs).

*Diane Toscano*, Assistant Deputy Public Defender, argued the cause for respondent, J.L.A. (*Zulima V. Farber*, Public Defender, attorney).

*Carol M. Henderson*, Deputy Attorney General, argued the cause for *amicus curiae*, Attorney General of New Jersey (*Fred DeVesa*, Acting Attorney General, attorney).

The opinion of the Court was delivered by

STEIN, J.

The narrow issue presented by this appeal is whether the Code of Juvenile Justice, *N.J.S.A.* 2A:4A–20 to –91 (Juvenile Code), should be construed to authorize the sentencing of juveniles who have committed two or more acts of delinquency to consecutive

terms of incarceration. The Juvenile Code is silent on the subject of consecutive sentences. The Appellate Division concluded that consecutive sentences are unauthorized. See *State in Interest of J.L.A.*, 262 *N.J.Super.* 78, 619 *A.*2d 1321 (1993). We granted the State's petition for certification, 134 *N.J.* 477, 634 *A.*2d 525 (1993).

I

For purposes of this appeal the underlying facts are not contested, and we adopt essentially the version set forth in the Attorney General's *amicus* brief.

On December 14, 1990, at about 11:00 p.m., J.L.A., a juvenile, and his companion approached David San Flippo and George Ingram, who were walking on Mt. Ephraim Avenue in Camden. J.L.A. demanded that San Flippo and Ingram give him "everything they had," pointing a sawed-off shotgun at them and stating, "we're not kidding." Ingram responded by pushing J.L.A.'s associate into him and running away. San Flippo hesitated, and then also turned and ran, pursued by J.L.A. J.L.A. then stopped and fired the shotgun at San Flippo, wounding him in the arm. J.L.A. fled. San Flippo was hospitalized for five days, and sustained nerve damage in his arm and wrist. J.L.A. was eventually apprehended, and identified by San Flippo and an eyewitness as the shooter.

Juvenile complaints were filed against J.L.A. in Camden County charging him with acts of delinquency that, if committed by an adult, would have constituted attempted armed robbery, in violation of *N.J.S.A.* 2C:5–1; second-degree aggravated assault, contrary to *N.J.S.A.* 2C:12–1b(1); first-degree armed robbery, in violation of *N.J.S.A.* 2C:15–1; and second-degree possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4a.

After a hearing the court adjudicated J.L.A. a delinquent. The Family Court merged the adjudications of attempted armed robbery and possession of a weapon for an unlawful purpose with the armed robbery adjudication. The court ordered that J.L.A. serve an indeterminate term of incarceration, not to exceed four years,

for armed robbery and a consecutive indeterminate term, not to exceed three years, for aggravated assault.

The Appellate Division affirmed the adjudications of delinquency but reversed the Family Court's imposition of consecutive sentences. The Appellate Division observed that the Legislature, in enacting the Juvenile Code, had established "in painstaking detail, a comprehensive scheme, essentially complete as written," finding "hard to imagine that the Legislature intended its silence as to [consecutive sentences] to stand for more than [their] omission." 262 *N.J.Super.* at 89, 619 *A.*2d 1321. In support of its conclusion that the Legislature had not intended to authorize imposition of consecutive sentences on juveniles, the Appellate Division specifically noted the provision of the Juvenile Code, *N.J.S.A.* 2A:4A–44d(4), authorizing imposition of an extended term of incarceration on a juvenile who commits three or more unrelated offenses at different times. The Appellate Division observed that because the authorized extended term cannot exceed the maximum permissible term of the most serious offense for which the juvenile has been adjudicated plus two years, a juvenile adjudicated delinquent for three unrelated offenses that would be first-degree offenses if committed by an adult would be subject to a statutory maximum sentence of incarceration of six years. 262 *N.J.Super.* at 90, 619 *A.*2d 1321 (construing *N.J.S.A.* 2A:4A–44d(1), (4)).

The Appellate Division explained that if consecutive sentences were authorized, a less culpable juvenile who committed "several offenses * * * in a single, isolated, aberrant criminal event would be subject to significantly greater punishment than a juvenile who undertook three separate and distinct criminal transactions." *Ibid.* Expressing doubt "that it could have been the Legislature's intent to expose the more culpable juvenile to a lesser penalty," the Appellate Division determined that imposition of consecutive sentences conflicted with the Juvenile Code provision authorizing extended terms: "While we might enforce what we would otherwise view as an unwise or an anomalous result if the Legislature

had clearly expressed its will, we will not supply, by implication, a term [that] conflicts in spirit with another provision of the Code." *Id.* at 91, 619 *A.*2d 1321.

## II

■ By framing the issue as whether the Legislature's enactment of the Juvenile Code reflected an intention to prohibit Family Courts from imposing consecutive sentences on juvenile offenders under *all* circumstances, we necessarily recognize the inherent power of the judiciary, absent a statutory prohibition, to impose consecutive sentences for separate offenses. That power is derived from the common law, and has consistently been recognized by our courts. In *State v. Maxey,* 42 *N.J.* 62, 198 *A.*2d 768 (1964), we acknowledged that "[t]he judicial power to impose consecutive sentences in this State is not founded upon statute but rather upon our common law, derived from the common law of England. * * * Consequently, our courts have the discretion and power to impose consecutive sentences for terms of years." *Id.* at 64, 66, 198 *A.*2d 768. In *Maxey,* the Court also observed that the inherent power of courts to sentence consecutively could be abrogated by statute: "In the absence of a statute expressly prohibiting the sentencing judge from exercising such discretion, we find that the power to impose consecutive life sentences resides in the trial judge." *Id.* at 69, 198 *A.*2d 768; *see also State v. Mahaney,* 73 *N.J.L.* 53, 56, 62 *A.* 265 (Sup.Ct.1905) ("[T]he great weight of authority in this country is that, without any statutory provision for consecutive sentences, the power to impose them resides in the court."), *aff'd,* 74 *N.J.L.* 849, 67 *A.* 1103 (E. & A. 1907).

Acknowledging that whether the Juvenile Code prohibits consecutive sentencing is a question of first impression, the State argues by analogy to cases holding that in sentencing young adult offenders to indeterminate terms at the Youth Correctional Institution Complex or Correctional Institution for Women pursuant to *N.J.S.A.* 2C:43–5, courts may impose consecutive sentences even though the relevant sentencing statute, *N.J.S.A.* 30:4–148, does

not specifically authorize them to do so. Beginning in 1957 with *State v. Horton*, 45 *N.J.Super.* 44, 131 *A.*2d 425 (App.Div.1957), our courts have recognized that trial courts may impose consecutive sentences on young adult offenders even though such sentences are neither expressly permitted nor prohibited by statute. In *Horton*, the defendant was initially sentenced concurrently on two counts of larceny. After escaping from the New Jersey Reformatory at Bordentown, he committed another larceny. When he was finally apprehended, he pled guilty to the larceny committed while at large. The trial court imposed a sentence on that larceny count " 'to run consecutively to any existing sentence.' " *Id.* at 45, 131 *A.*2d 425. Horton challenged the sentence, arguing that *N.J.S.A.* 30:4–148 did not authorize consecutive sentences. Rejecting his argument, the Appellate Division held, "The statute before us contains no restrictive provision against consecutive reformatory sentences; had the Legislature so intended, it could have explicitly so provided. We are of the opinion that the result arrived at by the trial judge was correct." *Id.* at 48, 131 *A.*2d 425. In *State v. Bono*, 128 *N.J.Super.* 254, 319 *A.*2d 762, *certif. denied*, 65 *N.J.* 572, 325 *A.*2d 705 (1974), the Appellate Division upheld the consecutive sentence of the defendant under the same statutory section at issue in *Horton*. The defendant had been sentenced consecutively on rape and lewdness charges. He contended that that disposition was not authorized by *N.J.S.A.* 30:4–148 and ran counter to the legislative policy of rehabilitation. Following *Horton, supra*, the Appellate Division concluded:

> Our court in *State v. Horton*, 45 *N.J.Super.* 44 [131 *A.*2d 425] (App.Div.1957), expressly declared that the imposition of consecutive reformatory sentences is not repugnant to the legislative policy of rehabilitation, and that the court has the power to impose consecutive terms under *N.J.S.A.* 30:4–148 * * *.
>
> While there may be some reservation as to the appropriateness of the imposition of consecutive indeterminate sentences in a particular case, nevertheless, such sentences are not repugnant to the theory of rehabilitation. Parole from an indeterminate term in the Youth Correctional Institution Complex is under the control of the Board of Trustees of the institution and parole release may occur at any time.

[*Id.* at 264–65, 319 *A.*2d 762.]

In *State v. Carroll*, 66 *N.J.* 558, 334 *A.*2d 17 (1975), the defendant had been sentenced to consecutive indeterminate terms at the Youth Correctional Institution Complex for robbery and receiving stolen property. The Appellate Division, concluding that consecutive sentences were inconsistent with the rehabilitative objective of indeterminate reformatory sentences, modified the sentence by imposing concurrent indeterminate terms. *State v. Carroll*, 128 *N.J.Super.* 234, 237–38, 319 *A.*2d 752 (1974). Although this Court affirmed the Appellate Division's disposition, noting that the defendant had already been released under both sentences, 66 *N.J.* at 561, 334 *A.*2d 17, we reaffirmed the legality of consecutive indeterminate sentences, and disagreed with the Appellate Division's conclusion that such sentences were inconsistent with a sentencing scheme that emphasized rehabilitation:

> The legality of consecutive indeterminate sentences has been consistently upheld in this State, *State v. Prewitt*, 127 *N.J.Super.* 560 [318 *A.*2d 427] (App.Div.1974); *State v. Horton*, 45 *N.J.Super.* 44 [131 *A.*2d 425] (App.Div.1957); see *State v. Bono*, 128 *N.J.Super.* 254, 264 [319 *A.*2d 762] (App.Div.1974). However, routine use of this kind of sentence as a sentencing mechanism is undesirable and should be avoided.
>
> \*     \*     \*     \*     \*     \*     \*     \*
>
> \* \* \* [U]nder certain circumstances, the imposition of consecutive indeterminate sentences serves a valid penological purpose. It enables the sentencing judge to indicate on the record that while a sentence to State Prison carrying a minimum term of confinement is not appropriate, the particular commitment to the Youth Complex is not routine and the board of trustees should be alert to special circumstances as outlined by the sentencing judge which the board should take into consideration in exercising its statutory power to terminate the confinement. Also, where necessary and proper, it permits an increase in the maximum term for which a defendant can be held should he fail to respond to the institutional therapy, or should he violate his parole after release.
>
> [66 *N.J.* at 561–62, 334 *A.*2d 17 (citations omitted).]

As suggested by our opinion in *Carroll, supra,* in determining whether consecutive sentences are permitted by the Juvenile Code courts must consider the critical factor of the extent to which such sentences are consistent with the Juvenile Code's rehabilitative and penological objectives. We note that the Juvenile Code authorizes the Family Court, after determining that a juvenile has committed an act of delinquency, to "impose such disposition or

dispositions over those persons subject to its jurisdiction [as are] consistent with the purposes of this act." *N.J.S.A.* 2A:4A–24a. In construing the Juvenile Code to ascertain whether consecutive sentences are permissible, we rely on the settled principle that "[t]he construction that will best effectuate the statute's ultimate objectives is to be preferred." *Cedar Cove, Inc. v. Stanzione,* 122 *N.J.* 202, 213, 584 *A.*2d 784 (1991); *see also State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980) ("In resolving * * * questions of statutory construction, we are mindful that our task is to effectuate the legislative intent in light of the language used and the objects sought to be achieved.")

Section 2 of the Juvenile Code, *N.J.S.A.* 2A:4A–21, sets forth the legislative purposes:

This act shall be construed so as to effectuate the following purposes:

a. To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of juveniles coming within the provisions of this act;

b. Consistent with the protection of the public interest, to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program of supervision, care and rehabilitation;

c. To separate juveniles from the family environment only when necessary for their health, safety or welfare or in the interests of public safety;

d. To secure for each child coming under the jurisdiction of the court such care, guidance and control, preferably in his own home, as will conduce to the child's welfare and the best interests of the State; and when such child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents;

e. To insure that children under the jurisdiction of the court are wards of the State, subject to the discipline and entitled to the protection of the State, which may intervene to safeguard them from neglect or injury and to enforce the legal obligations due to them and from them.

The Appellate Division characterized the stated purposes of the Juvenile Code as "fundamentally rehabilitative." 262 *N.J.Super.* at 80, 619 *A.*2d 1321. We agree that rehabilitation traditionally has been regarded as the overarching objective of statutory schemes addressing juvenile delinquency, see *In re Lewis,* 11 *N.J.* 217, 224, 94 *A.*2d 328 (1953), and that rehabilitation remains a primary goal of the Juvenile Code. Nevertheless, the Juvenile

Code also reflects a correlative emphasis on public safety and deterrence. See *N.J.S.A.* 2A:4A–21b (stating that *"[c]onsistent with the protection of the public interest,"* courts may substitute an adequate program of supervision for "certain statutory consequences of criminal behavior"); *N.J.S.A.* 2A:4A–21c (providing for separation of juveniles from their families *"in the interests of public safety"*); *N.J.S.A.* 2A:4A–21e (providing that juveniles under jurisdiction of Family Court are *"subject to the discipline"* of State) (emphases added).

The Senate Judiciary Committee Statement accompanying the Juvenile Code demonstrates that the Legislature intended that the Juvenile Code serve the needs of public safety as well as the rehabilitative needs of juvenile offenders:

> This bill recognizes that the *public welfare and the best interests of juveniles* can be served most effectively through an approach which provides for *harsher penalties for juveniles who commit serious acts or who are repetitive offenders,* while broadening family responsibility and the use of alternative dispositions for juveniles committing less serious offenses. Moreover, the provisions of this bill and the other accompanying bills reflect a philosophy *which is pragmatic and realistic in nature rather than bound to any particular ideology.*

> [Senate Judiciary Committee, *Statement to Assembly Bill No. 641* (1982) (emphasis added).]

Explaining the significance of section 2 of the Juvenile Code (*N.J.S.A.* 2A:4A–21), the Committee Statement emphasizes that the legislative purposes encompassed public safety as well as rehabilitation: "Section 2 states general purposes of the act. The language in this section combines the purpose sections in the current juvenile statutes and stresses such concepts as the preservation of the family unit and the rehabilitation of juveniles *consistent with the protection of the public." Ibid.* (emphasis added).

The Juvenile Delinquency Commission, a commission created by the Juvenile Code itself (*N.J.S.A.* 2A:4A–49) to study the impact of the Juvenile Code and to make recommendations regarding the implementation and effectiveness of the Juvenile Code's provisions, shares the view that the Juvenile Code combines the need for the punishment of juveniles with the rehabilitative aspects of

juvenile justice. In its 1988 Annual Report, the Commission offered this interpretation of the purposes of the Juvenile Code:

> Another explicit purpose of the Code, however, is to "enforce the legal obligations" of juveniles. The Code specifies that "the nature and circumstances of the offense" and "the degree of injury to persons or damage to property caused by the juvenile's offense" are factors to be considered in a disposition. These offense-specific characteristics are typically the measures of blameworthiness or culpability employed in "just deserts" sentencing laws to determine the commensurate level of punishment. The delineation of these factors, along with the statement of purpose and the Senate Judiciary Committee's statement indicating that one of the law's objectives is to provide "harsher penalties for juveniles who commit serious acts or who are repetitive offenders," are indications that the Legislature also viewed retributive sentencing goals as legitimate.

> [*Juvenile Justice—Toward Completing the Unfinished Agenda: 1988 Annual Report of the Juvenile Delinquency Commission* 42 (hereinafter *1988 Annual Report* ).]

In signing the Juvenile Code into law, then-Governor Thomas Kean endorsed the view of the Senate Judiciary Committee that the Code's objectives included both rehabilitation and deterrence:

> "It recognizes very clearly the need to deal swiftly and sternly with violent young criminals and it tempers that recognition with the understanding that there are cases in which counseling and rehabilitation will be an adequate and appropriate response."

> \*          \*          \*          \*          \*          \*          \*          \*

> "This program achieves a balance between the need for law-abiding society to be protected from the violent acts of young persons and the need for that same society to rehabilitate juveniles and turn them away from a career of crime."

> [*Governor's Message on Signing Assembly Bill No. 641* (July 23, 1982).]

In *State v. R.G.D.*, 108 *N.J.* 1, 527 *A*.2d 834 (1987), Justice O'Hern also acknowledged the Legislature's objective to authorize more severe punishment for juveniles who commit serious offenses, focusing on the revised waiver provisions of the Code:

> The goal of the new legislation in this regard was to deal more strictly with serious offenders. In keeping with that pragmatic philosophy, the newly revised Code contained, among many others, a change concerning the prosecutor's motion for referral of a case to adult court without the juvenile's consent. *N.J.S.A.* 2A:4A–26. The Act broadened the class of offenders eligible for waiver and revised the standards for waiver in certain cases.

> [*Id.* at 9, 527 *A*.2d 834.]

## III

The basic question we must resolve is whether the Legislature's silence concerning consecutive sentences in the Juvenile Code necessarily reflects an intent to prohibit their imposition. We decline to attribute to the Legislature a determination to preclude courts from imposing consecutive sentences on juveniles who commit multiple offenses.

We acknowledge the persuasiveness of the Appellate Division's observation that in enacting the Juvenile Code, the Legislature provided "in painstaking detail, a comprehensive scheme, essentially complete as written," 262 *N.J.Super.* at 89, 619 *A.*2d 1321, and that omission of consecutive sentences from the Juvenile Code's elaborate specification of alternative dispositions meant that the Legislature intended to prohibit such sentences. *Ibid.* However, much the same observation could be made about the Legislature's failure to authorize consecutive sentences for young adult offenders, see *N.J.S.A.* 30:4–148, and yet the Legislature apparently has acquiesced to the long-standing judicial interpretation of that statute, which permits imposition of consecutive sentences. *Supra* at 374–376, 643 *A.*2d at 540–541.

The Appellate Division also found persuasive one of the Juvenile Code's provisions authorizing extended-term sentencing, *N.J.S.A.* 2A:4A–44d(4). Under that section, a juvenile facing sentencing for three or more unrelated crimes can be sentenced to the maximum term for the most serious offense plus two years. In the Appellate Division's view, an interpretation of the Juvenile Code that permitted consecutive sentences would expose a juvenile who had committed multiple offenses in a "single, isolated aberrant criminal event" to "significantly greater punishment than a juvenile who undertook three separate and distinct criminal transactions." 262 *N.J.Super.* at 90, 619 *A.*2d 1321.

We understand the Appellate Division's concern about the apparent inconsistency between extended-term and consecutive sentencing. That inconsistency is diminished if the Juvenile Code is understood to permit consecutive sentences, in that the juvenile

offender eligible for the extended term could alternatively be sentenced to consecutive terms. We also note, however, that in 1986 the Juvenile Delinquency Commission acknowledged that the extended-term provisions were rarely used, speculating that the restrictions on the applicability of extended terms limit their relevance as a sentencing option:

> [O]ur analysis indicates that extended terms are not being used. From July to December, 1984, fewer than five extended terms were utilized. Several factors may account for limited use. Some have suggested that both Prosecutors and Judges are unfamiliar with this provision. Additionally, there is evidence suggesting that the provision as currently drafted has practical limitations.
>
> [1 *The Impact of the New Jersey Code of Juvenile Justice: 1986 Annual Report of the Juvenile Delinquency Disposition Commission* 86.]

In its 1988 Annual Report, the Commission once again found that the use of extended terms of incarceration was infrequent. *See 1988 Annual Report, supra,* at 64. We conclude that the extended-term provisions are reconcilable with an interpretation of the Juvenile Code that permits the Family Court to impose consecutive sentences in appropriate cases. We infer that such sentences will be used only in exceptional cases involving multiple offenses in which the court concludes that an extended term is inapplicable or inappropriate and that the rehabilitative and public-safety objectives of the Juvenile Code cannot be vindicated by concurrent terms.

Consistent with our observations in *Carroll, supra,* 66 *N.J.* at 562, 334 *A.*2d 17, consecutive sentences for juvenile offenders should be the exception and not the rule, but they may in certain circumstances complement and reinforce both the rehabilitative and penological purposes of the Juvenile Code. We note that the Juvenile Code authorizes maximum terms of incarceration ranging from one to four years for offenses that would constitute crimes of the fourth, third, second and first degrees (except murder) if committed by an adult. *N.J.S.A.* 2A:4A–44d(1). The presumptive parole release terms for those same offenses range from five months for a fourth-degree crime to twenty months for a first-degree crime. *N.J.A.C.* 10A:71–3.23(a). An interpretation of the Juvenile Code that guarantees to juvenile offenders ineligible for

an extended term that they will not be punished more severely for multiple offenses than for one offense breeds disrespect for law and implies that juvenile offenders will not be held accountable for multiple acts of unlawful conduct. In certain circumstances, the availability of consecutive sentences may permit the Family Court to advance a juvenile's rehabilitation by demonstrating that those who commit crimes can be punished separately for each instance of misconduct. That a juvenile has received concurrent or consecutive sentences is considered an aggravating factor in the determination of a juvenile's parole-release date. See *N.J.A.C.* 10A:71–3.23(c)(2)(viii). (Because that regulation pre-dates the Juvenile Code, it does not influence our conclusion that the statute should be construed to permit consecutive sentences.) Thus, the parole authorities can evaluate the significance of the juvenile's commission of multiple offenses and the Family Court's decision to impose consecutive sentences in determining whether the Code's rehabilitative purposes have been satisfied.

Nevertheless, a fully-rehabilitated juvenile should not languish unnecessarily in a correctional facility because the court sentenced the juvenile to consecutive terms. Unlike multiple sentences of imprisonment for adult inmates, see *N.J.S.A.* 30:4–123.51h, multiple sentences for juveniles are not aggregated in determining the juvenile's primary parole-eligibility date. The relevant regulation provides that if a juvenile is incarcerated for several acts of delinquency, "the act of delinquency [that] represents the most serious act of delinquency shall be considered in determining the tentative parole release date." *N.J.A.C.* 10A:71–3.23(b). Moreover, the Juvenile Code authorizes the sentencing court on motion to return a juvenile from a correctional institution at which the juvenile has been incarcerated prior to parole and to provide for an alternative disposition not exceeding the time remaining to be served in the institution. *N.J.S.A.* 2A:4A–44d(2). Accordingly, we are satisfied that the statutory and regulatory provisions governing release of juveniles from incarceration are sufficiently flexible to ensure that the power to impose consecutive sentences

can be harmonized with the rehabilitative purposes of the Juvenile Code.

### IV

Because we conclude that the Juvenile Code should not be interpreted to prohibit imposition of consecutive sentences, we reverse the judgment of the Appellate Division to the extent that it set aside the sentences imposed by the Family Court.

*For affirmance* —None.

*For reversal in part* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.