49 A.3d 877

STATE OF NEW JERSEY IN THE INTEREST OF J.J.

Superior Court of New Jersey
Appellate Division

Argued June 6, 2012—Decided August 23, 2012.

Before Judges CUFF, LIHOTZ, and WAUGH.

*Sandra Simkins,* Director of Clinical Programs, Co–Director of Children's Justice Clinic, and *Lisa M. Geis,* argued the cause for appellant J.J. (*Children's Justice Clinic, Rutgers School of Law–Camden,* attorneys; *Ms. Simkins,* of counsel and on the briefs; *Ms. Geis,* on the briefs).

*Daniela Ivancikova,* Deputy Attorney General, argued the cause for respondent the Juvenile Justice Commission and the Department of Corrections (*Jeffrey S. Chiesa,* Attorney General, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel; *Ms. Ivancikova,* on the brief).

The opinion of the court was delivered by

WAUGH, J.A.D.

This case requires us to determine whether procedural due process rights must be accorded to an adjudicated juvenile prior to transfer from a juvenile facility operated by the Juvenile Justice Commission (JJC) to an adult correctional facility operated by the Department of Corrections (DOC) pursuant to the provisions of *N.J.S.A.* 52:17B–175(e). That statute permits such transfers of a juvenile "who has reached the age of 16 during confinement and whose continued presence in the juvenile facility threatens the public safety, the safety of juvenile offenders, or the ability of the commission to operate the program in the manner intended." The State takes the position that no due process rights of any kind, including notice and an opportunity to be heard, are required. We disagree and reverse.

## I.

We discern the following facts and procedural history from the record on appeal.

In December 2010, the Family Part adjudicated J.J., to whom we refer by the pseudonym Jones, a delinquent and committed him to the custody of the JJC for a period of four years for conduct that, if committed by an adult, would constitute one count of first-degree attempt, contrary to *N.J.S.A.* 2C:5–1, one count of first-degree robbery, contrary to *N.J.S.A.* 2C:15–1(a)(2), and one count of fourth-degree resisting arrest, contrary to *N.J.S.A.* 2C:29–2(a).[1] The JJC initially placed Jones in the New Jersey Training School (NJTS) in January 2011. He was subsequently moved to the Juvenile Medium Security Facility (JMSF) in Bordentown.

---

[1] Jones was eighteen years old at the time of his adjudication, but was a juvenile when the offenses were committed. The determining factor concerning the Code's applicability and the jurisdiction of the Family Part is the age at which the underlying offense was committed. *N.J.S.A.* 2A:4A–23.

For the thirty-eight-week period during which his behavior was evaluated under the JJC's "weekly rating system" at both facilities, Jones met "behavioral standards" for twenty-six weeks, but "fail[ed] to meet behavioral standards" for twelve weeks. While at JMSF, Jones met "behavioral standards" for twenty weeks, including the three weeks prior to his transfer to the custody of the DOC, and "fail[ed] to meet behavioral standards" for seven-and-one-half weeks.

Jones was charged with "assault on staff" for punching a JJC corrections officer in the face on October 13, 2011. The alleged assault took place after the officer ordered him to return to his housing unit and then attempted to prevent Jones from entering the vocational area. Jones claimed that he had been provoked by the officer, and that he acted in self-defense when the officer hit him. The officer suffered slight swelling, and complained of numbness and pain in his left upper cheek.

Jones was charged with disciplinary infractions and was found guilty by a hearing officer on October 14. The hearing officer imposed five days of room restriction as discipline for the infractions. Jones filed an immediate administrative appeal. He placed a check-mark next to "plea of leniency" on the portion of the appeal form that asked why he was requesting an appeal. He wrote: "I want to have [an] Appeal on this case." The hearing officer's decision was upheld, without explanation, the same day. Jones did not file a timely appeal from that determination.

At the same time, without any notice to Jones, the JJC staff began a review of his classification to determine whether he should be transferred to the custody of the DOC. The Juvenile Reception Classification Committee (JRCC) recommended that Jones be transferred. The report making the recommendation provided as follows:

> This report is being written to request the transfer of Resident [Jones] to the Department of Corrections.
>
> Resident [Jones] was received at the New Jersey Training School (NJTS) Reception Unit as a new admission on January 4, 2011. He was sentenced to an indeterminate 4-year term for Criminal Attempted Robbery and Resisting Arrest.

Resident [Jones] is from Cumberland County. As of this writing, he has a Tentative Release Date of December 29, 2013.

During this commitment, Resident [Jones] received a total of 14 disciplinary charges. It should be noted however that eight of these charges were of [an] aggressive nature. Resident [Jones] has received four charges for Fighting, one for Unauthorized Physical Contact (bit a correction officer on the hand), one for Assault on a Staff Member and one for Attempting to Assault Another Resident. Additionally, he received two charges for Disrupting the Security and Order of the Facility. As of this writing, Resident [Jones] has served a total of 26 days in room restriction.

While at NJTS, Resident [Jones] did receive a total of six disciplinary charges. The first three were for Fighting with his peers. Resident [Jones'] disciplinary charges began to exacerbate in nature, as on April 7, 2011 he received an Assault on Staff charge for shooting a rubber band into the eye of a female Senior Youth Worker. Resident [Jones] claimed that the incident was an accident, but the report writer clearly indicated the rubber band shot was fired directly after he called her by name to gain her attention. This incident along with a charge for hiding his medication resulted to his transfer to the Juvenile Medium Security Facility (JMSF) on April 28, 2011. This speaks directly to his arrogant attitude and insolent behavior.

After being placed on the Behavior Accountability Unit (BAU) for six days, Resident [Jones] was afforded the opportunity to reside on the self-contained H–Wing. This unit has a smaller population and more staff assigned and it was the feeling of staff/administration that this unit might be more beneficial for Resident [Jones]. It should also be noted that while at NJTS, he resided on HU–11, which is the mirror image of H–Wing at JMSF. Resident [Jones] did not do well there either.

It was only five days after arriving on H–Wing, when Resident [Jones] received a charge for Conduct Which Disrupts. He attempted to assault another resident as he was being escorted off the unit by an area supervisor and SA officers. Resident [Jones] exhibits very inconsistent behavior. He has had a number of outbursts in school, treatment teams and family counseling sessions. One incident occurred in the social worker's office on June 28, 2011. A disagreement between he and staff propelled the resident into a fury that led to him directing abusive language and threats to the social worker, superintendent and his own mother who was on the phone at the time. He did receive an Abusive Language charge for that incident.

On July 22, 2011, he received an Unauthorized Physical Contact charge. In this instance, he lunged at another resident throwing punches to his face and body because of a verbal exchange. Resident [Jones'] emotions manifest themselves as hostile language, threats and other forms of aggressive behavior. Resident [Jones] is older and tries to intimidate his peers, as he has the physical size (6'2" and over 200 lbs.) commensurate to an adult.

Resident [Jones'] actions have continued to wreak havoc. On July 22, 2011, he received Disrupting Security and Order of the Facility, Unauthorized Physical Contact and Abusive Language charges. At this time, Resident [Jones] did bite an officer. In addition, he attempted to harm, threaten and intimidate potential

witnesses. Resident [Jones'] behaviors continue to make him a threat to the safety and security of, not only residents, but staff as well. On August 7, 2011, Resident [Jones'] aggressive behavior was once again noted as he pushed another resident out of his way, which resulted in a fighting charge. Just recently, on October 13, 2011, Resident [Jones] received an Assault on Staff charge for assaulting a Correction Officer by punching him in the face. This incident led to the officer being transported to the hospital for medical attention.

Resident [Jones'] behaviors are not getting better as he continues to operate as a "loose cannon" who has demonstrated he will do anything at anytime against anyone. He is very comfortable getting out of control and relishes that role. Resident [Jones] views himself as untouchable. He needs to be transferred to the adult complex to serve as an example to the other residents who may try to emulate his example. We have made every effort to get Resident [Jones] to conform to programs offered him in the juvenile setting. He has not done so. We at this facility are recommending that Resident [Jones] be accepted in an adult facility based upon the following:

1. Age: 18.11

2. Aggressive and assaultive history: Resident has received four fighting charges, and two assault on staff offenses, during his commitment.

3. Resident has not conformed to program interventions made available to him in the juvenile setting despite being placed in the most optimum (Housing Unit 11 and H–Wing) setting for him.

4. Resident has been before the Parole Board three times and has yet to receive a parole reduction.

5. Resident needs to serve as an example for others who exhibit abhorrent behavior.

6. Time to Serve: Resident has a four-year tem with a Tentative Release Date of December 29, 2013.

7. Resident has the physical size and stature commensurate to persons housed in the adult complex.

8. Based upon all the above, this resident is no longer suitable for confinement within the Juvenile Justice Commission.

On October 26, the JJC recommended the transfer and forwarded the request to DOC. On November 1, the DOC Commissioner approved the transfer. Jones was not notified of the review, the JRCC's recommendation, the JJC's approval of the recommendation and submission to DOC, or DOC's approval of the transfer.

On November 4, JJC personnel informed Jones that he was being transferred to the custody of DOC that day. He was immediately transported to DOC's Central Reception and Assignment Facility (CRAF) in Trenton. While there, Jones asked a CRAF corrections officer if he could telephone his mother. His

request was denied. It appears that his mother was not notified for several days, and that his attorney and the Family Part judge were not notified of the transfer by the JJC.

Jones was subsequently transferred to the Garden State Youth Correctional Facility in Yardville. He was then transferred to the South Woods State Prison (South Woods) in Bridgeton, where he is housed in the Special Needs Unit that provides mental health care.[2]

In December 2011, Jones commenced an effort in the Family Part to contest the transfer, seeking return to the custody of the JJC and a declaration that the transfer regulations, *N.J.A.C.* 13:91–1.1 to –2.5, are unconstitutional. Those efforts were voluntarily withdrawn in early January 2012.

On January 13, Jones filed the present appeal, in which he raises essentially the same issues. He also filed a motion for summary disposition, to stay enforcement of the transfer, and to proceed without a final agency decision. He subsequently moved to supplement the record.

DOC and JJC opposed Jones' motions, and cross-moved to dismiss the appeal or, in the alternative, for summary disposition. On March 6, we granted Jones' motions to proceed without a final agency decision and to supplement the record, but denied the stay. We also denied the State's cross-motion.

## II.

On appeal, Jones raises the following issues:

I. [JONES] IS SERVING A DE FACTO SENTENCE OF THREE YEARS IN ADULT PRISON WITHOUT EVER BEING AFFORDED DUE PROCESS PROTECTIONS

---

[2] Because there was uncertainty about whether Jones was about to be transferred to the general population at South Woods at the time this appeal was before us for oral argument, we entered an order on June 8, 2012, staying any such transfer pending our disposition of the appeal.

A. Transferring [Jones] Without Providing a Right to Trial by Jury Violated His Due Process Rights Under the New Jersey and United States Constitutions

B. Transferring [Jones] Without Notice Violated His Right to Due Process Under the United States and New Jersey Constitutions

 1. No notice at time of the plea

 2. No notice in the JJC handbook

 3. No notice from Parole Board meeting 10 days prior to transfer

C. Transferring [Jones] Without Assistance of the Counsel Violated the New Jersey and United States Constitutions

D. Transferring [Jones] Without the Opportunity to Confront Witnesses Violates the Due Process Clause of the New Jersey and United States Constitutions

II. PLACING [JONES] IN ADULT PRISON EXCEEDS THE LIMITATIONS OF FAMILY COURT, IGNORES THE PURPOSE OF THE JUVENILE CODE, AND DISREGARDS THE EXPLICIT DISPOSITION ORDER OF THE JUVENILE COURT JUDGE

A. The DOC and the JJC are Separate Agencies With Different Missions

B. In Transferring [Jones], the JJC Unconstitutionally Disregarded the Family Part Judge's Final Order of Disposition

III. WHEN VIEWED IN THE CONTEXT OF HIS MENTAL HEALTH HISTORY, [JONES'] DISCIPLINARY HISTORY DID NOT RISE TO THE LEVEL REQUIRING TRANSFER BY THE REGULATION

A. The JJC Ignored Its Own Internal Reports Which Classified [Jones] as Multiply Disabled, Recommended a DDD Evaluation and Revealed a Full Scale I.Q. of 67

B. Documentation Submitted to Support [Jones'] Transfer Did Not Include "Progress Notes" as Required by the Administrative Code

C. The JJC had Other Recourses Available to Address [Jones'] Disciplinary Infractions, Rather than Transfer [Jones] to Adult Prison

IV. [JONES'] Request To Appeal The Precipitating Disciplinary Sanction Was Summarily Denied Without Investigation Or A Statement Of Reason

A. On October 13, [Jones] Acted in Response to Being Hit by a Correction Officer

B. [Jones'] Request to Appeal was Denied Within Two Hours of the Courtline Decision

C. Request to Appeal Denied Without Investigating Witnesses

Before addressing those issues, we outline the statutory and regulatory background of our system of juvenile justice and the JJC.

## A.

The Code of Juvenile Justice (Code), *N.J.S.A.* 2A:4A–20 to –90, was enacted in 1982 [3] to "govern[ ] juvenile delinquency matters." *State ex rel. C.V.,* 201 *N.J.* 281, 294, 990 *A.*2d 640 (2010). The overall purpose of the Juvenile Code was outlined in the Senate Judiciary Committee Statement (Committee Statement) to Assembly Bill 641 (1982), in part, as follows:

> This bill recognizes that the public welfare and the best interests of juveniles can be served most effectively through an approach which provides for harsher penalties for juveniles who commit serious acts or who are repetitive offenders, while broadening family responsibility and the use of alternative dispositions for juveniles committing less serious offenses.
>
> [Committee Statement following *N.J.S.A.* 2A:4A–20, at 173 (West 2011).]

The Code confers "exclusive jurisdiction" of juvenile delinquency matters on the Family Part. *N.J.S.A.* 2A:4A–24(a). It empowers the Family Part to enter dispositions that "comport with the Code's rehabilitative goals." *C.V., supra,* 201 *N.J.* at 295, 990 *A.*2d 640 (citing *State ex rel. J.L.A.,* 136 *N.J.* 370, 376–77, 643 *A.*2d 538 (1994)). Nevertheless, our courts also recognize that the Code serves a penal purpose. *State ex rel. J.D.H.,* 171 *N.J.* 475, 483, 795 *A.*2d 851 (2002); *State ex rel. M.C.,* 384 *N.J.Super.* 116, 118, 894 *A.*2d 60 (App.Div.2006).

The Code provides juvenile offenders with most, but not all, of the rights of criminal defendants. These include the right to counsel, *N.J.S.A.* 2A:4A–39, the right to present all defenses available to adult offenders, *N.J.S.A.* 2A:4A–40, and all rights guaranteed to adult offenders under both the federal and state constitutions, but do not include the rights to indictment, trial by jury, and bail, *ibid.* In addition, the Code provides for reduced periods of incarceration in comparison with adult offenders. For example, Jones faced a maximum custodial term of four years as a juvenile for conduct that, if committed by an adult, would have constituted first-degree robbery under *N.J.S.A.* 2C:15–1. He would have faced a term of incarceration between ten and twenty

---

[3] The Code took effect in December 1983.

years under *N.J.S.A.* 2C:43–6(a)(1), subject to an eighty-five-percent period of parole ineligibility under *N.J.S.A.* 2C:43–7.2(d), had he been tried and convicted as an adult.

If a juvenile is adjudicated delinquent, the Code provides the Family Part with a variety of dispositional options, including incarceration. *N.J.S.A.* 2A:4A–43(b). Terms of incarceration generally range from six months to four years, depending on the nature of the offense.[4] *N.J.S.A.* 2A:4A–44(d)(1)(c)–(g). When a court orders incarceration for more than sixty days in approved county facilities, *see N.J.S.A.* 2A:4A–43(c), (e), the court "shall . . . commit the juvenile to the custody of the [JJC] which shall provide for the juvenile's placement in a suitable juvenile facility," *N.J.S.A.* 2A:4A–44(d)(1).

The JJC was created in 1995 "to oversee all juvenile justice matters." *Cnty. of Hudson v. Dep't of Corr.,* 152 *N.J.* 60, 66, 703 *A.*2d 268 (1997) (citing *N.J.S.A.* 52:17B–170(a)). Prior to creation of the JJC, "preventive, deterrent and rehabilitative services and sanctions for juveniles," *N.J.S.A.* 52:17B–169(d), were the responsibility of three departments:

> The Department of Law and Public Safety deal[t] with county prosecutors and local police and implement[ed] prevention programs; the [DOC] operate[d] the New Jersey Training School for Boys and the Juvenile Medium Security Facility, and its Bureau of Parole supervise[d] juvenile parolees; and the Department of Human Services operate[d] residential and day programs in facilities for juveniles adjudicated delinquent.
>
> [*Ibid.*]

As the Supreme Court noted in *County of Hudson, supra,* 152 *N.J.* at 67, 703 *A.*2d 268,

> [t]he Legislature, in effect, transferred and consolidated the authority over the juvenile justice system previously exercised by the three separate executive departments. Under *N.J.S.A.* 52:17B–176, the Legislature placed in the JJC all of

---

4 The custodial terms for murder are twenty years if the conduct involved, when committed by an adult, would constitute purposeful or knowing murder under *N.J.S.A.* 2C:11–3(a)(1) or (2), and ten years if the conduct would constitute felony murder under *N.J.S.A.* 2C:11–3(a)(3). *N.J.S.A.* 2A:4A–44(d)(1)(a)–(b). The Code also provides for extended term sentences for certain juvenile offenders. *N.J.S.A.* 2A:4A–44(d)(3)–(4).

the powers and responsibilities the other three agencies had in respect of juveniles. The Legislature empowered the JJC to establish standards for the "care, treatment, government and discipline of juveniles" adjudicated delinquent, *N.J.S.A.* 52:17B–170e(6), to assume the custody and care of juveniles committed to it by law, *N.J.S.A.* 52:17B–170e(7), to formulate and adopt standards and rules for the efficient running of the commission and its facilities, *N.J.S.A.* 52:17B–170e(14), and to promulgate rules and regulations necessary to effectuate the purposes of the commission, *N.J.S.A.* 52:17B–170e(22).

The JJC's executive director has responsibility for "each secure juvenile facility [and] juvenile facility" operated by the JJC. *N.J.S.A.* 52:17B–171(b)(1). All such juvenile facilities previously operated by DOC were transferred to the JJC. *N.J.S.A.* 52:17B–176.

The statute that created the JJC specifically permits the transfer of a juvenile from the custody of the JJC to that of the DOC, subject to certain specific requirements. *N.J.S.A.* 52:17B–175(e) provides, in relevant part, as follows:

The [JJC] and the Commissioner of the [DOC] shall, consistent with applicable State and federal standards, formulate a plan setting forth procedures for transferring custody of any juvenile incarcerated in a juvenile facility who has reached the age of 16 during confinement and whose continued presence in the juvenile facility threatens the public safety, the safety of juvenile offenders, or the ability of the commission to operate the program in the manner intended.

The implementing regulations were initially adopted in 1997, and have been readopted in 2002 and 2008. *N.J.A.C.* 13:91–1.1 (chapter notes).

The criteria for transfer are set forth in *N.J.A.C.* 13:91–2.1, as follows:

(a) An individual adjudicated delinquent who is 18 years of age or older and incarcerated in a juvenile facility may be transferred to the custody and care of the Department when:

1. He or she demonstrates disruptive behavior and his or her continued presence in the juvenile facility threatens:

i. The safety of the public, juvenile facility staff or other adjudicated delinquents; and/or

ii. The ability of the Commission to operate the juvenile facility in a stable, safe and orderly manner;

2. His or her maturity level and criminal sophistication makes him or her inappropriate for the available Commission programs; or

3. His or her continued presence in the juvenile facility impedes the effective delivery of the programs, services and sanctions developed and implemented by the Commission to meet the special needs of the juvenile aged offenders committed to the care, custody and control of the Commission.

While *N.J.S.A.* 52:17B–175(e) permits the transfer of a juvenile sixteen or older, the implementing regulations only permit transfer for adjudicated juveniles eighteen and over. The regulation's higher age was explained in the most recent proposal for readoption as follows:

The higher age threshold used in the rules is to ensure continued Federal funding of State and county programs under the Federal Juvenile Justice and Delinquency Prevention Act, *P.L.* 102–586, (JJDPA). Federal regulations at 28 [*C.F.R.*] 31.303, adopted pursuant to the provisions of the JJDPA, condition formula grants from the Federal government on a state maintaining sight and sound separation between adjudicated delinquents and convicted adult offenders at correctional facilities. The JJDPA requires adjudicated delinquents to have reached the age of full criminal responsibility established by state law before they may be transferred to an adult facility, and then only if state law authorizes such transfers. The rules proposed for readoption at *N.J.A.C.* 13:91 satisfy the provisions of the Federal regulations (28 [*C.F.R.*] Part 31) because the age of full criminal responsibility in New Jersey is 18, and transfers to adult facilities are expressly authorized by State law, *N.J.S.A.* 52:17B–175(e).

[40 *N.J.R.* 97 (Jan. 7, 2008).]

The transfer regulation contains procedural requirements for the internal decision making process at the JJC and DOC, but no requirement that the juvenile at issue receive any level of procedural due process. As illustrated by the facts of this case, JJC staff simply notify the juvenile of the transfer as it is actually taking place.

B.

 Jones argues that his constitutional right to a trial by jury has been infringed because his transfer to an adult prison was based on an adjudication of delinquency resulting from a bench trial. He also points to the total denial of procedural due process in the transfer procedure established by the regulations adopted by the JJC and DOC.

██ It is well established that due process in the context of juvenile proceedings does not include the right to a jury trial. *In re Registrant J.G.*, 169 *N.J.* 304, 338, 777 *A.2d* 891 (2001) (citing *McKeiver v. Pennsylvania*, 403 *U.S.* 528, 545, 91 *S.Ct.* 1976, 1986, 29 *L.Ed.2d* 647, 661 (1971)); *State ex rel. A.C.*, 424 *N.J.Super.* 252, 254–55 (App.Div.2012). Jones argues, however, that the transfer of an adjudicated juvenile from a JJC facility to one of DOC's adult prisons changes the nature of the proceeding such that a jury trial is required, citing several out-of-state cases in support of his argument.

Courts in other jurisdictions have reached different conclusions with respect to this issue. In *In re C.B.*, 708 *So.2d* 391, 399 (La.1998), the Louisiana Supreme Court held unconstitutional a statute permitting the transfer of all juveniles who reached the age of seventeen to adult facilities, at which they would be required to perform hard labor. Applying the Louisiana Constitution, the court concluded

> Due process and fundamental fairness therefore require that the juvenile who is going to be incarcerated at hard labor in an adult penal facility must have been convicted of a crime by a criminal jury, not simply adjudicated a delinquent by a juvenile court judge. To deprive the juvenile of such an important procedural safeguard upsets the quid pro quo under which the juvenile system must operate. The hallmark of special juvenile procedures is their non-criminal nature. If, after adjudication in the juvenile court, the juvenile can be committed to a place of penal servitude and required to perform hard labor alongside convicted felons, then "the entire claim of parens patriae becomes a hypocritical mockery." *Londerholm v. Owens*, 197 *Kan.* 212, 416 *P.2d* 259, 269 (Kan.1966). In such a case, dispensation of the traditional safeguard of a jury trial cannot meet the basic requirements of fundamental fairness implicit in the due process clause of Article I, § 2 of our state constitution.
>
> [*Id.* at 400.]

*See also In re Rich*, 125 *Vt.* 373, 216 *A.2d* 266, 269 (1966) ("Confinement in a penal institution will convert the proceedings from juvenile to criminal and require the observance of constitutional criminal safeguards."); *Boone v. Danforth*, 463 *S.W.2d* 825, 830 (Mo.1971); *State ex rel. McGilton v. Adams*, 143 *W.Va.* 325, 102 *S.E.2d* 145, 146–49 (1958). Courts have also invalidated court dispositions which commit adjudicated delinquents directly to

adult penal institutions. *See, e.g., B.A.M. v. State,* 528 *P.*2d 437 (Alaska 1974); *Londerholm, supra,* 197 *Kan.* 212, 416 *P.*2d 259; *State v. Fisher,* 17 *Ohio App.*2d 183, 245 *N.E.*2d 358 (1969).

Other courts have upheld provisions for transfer from a juvenile to an adult facility. *Arkadiele v. Markley,* 186 *F.Supp.* 586 (S.D.Ind.1960); *Clay v. Reid,* 173 *F.Supp.* 667 (D.D.C.1959); *United States v. McCoy,* 150 *F.Supp.* 237 (M.D.Pa.1957); *Suarez v. Wilkinson,* 133 *F.Supp.* 38 (M.D.Pa.1955); *Wilson v. Coughlin,* 259 *Iowa* 1163, 147 *N.W.*2d 175 (Iowa 1966); *Cope v. Campbell,* 175 *Ohio St.* 475, 196 *N.E.*2d 457 (1964); *In re Darnell,* 173 *Ohio St.* 335, 182 *N.E.*2d 321 (1962); *Long v. Langlois,* 93 *R.I.* 23, 170 *A.*2d 618 (1961).

We are persuaded by the Supreme Court of Washington's reasoning in *Monroe v. Soliz,* 132 *Wash.*2d 414, 939 *P.*2d 205, 208 (1997), that a change in the place of confinement does not transform the essential nature of the judicial proceedings from juvenile to criminal:

> Monroe's basic claim is that the administrative transfer of a juvenile from a detention facility to an adult prison alters the focus of the juvenile's incarceration, changing it from rehabilitative to punitive. Thus, Monroe argues, because he would be punished if housed in the adult prison, the law affords him a right to a jury trial. We believe this overstates the nature of the administrative transfer. At the heart of the issue is whether the place of a person's confinement defines the nature of the proceeding. *RCW* 13.40.280 does not, and cannot, substantively convert a juvenile proceeding to a criminal one. The basis for the juvenile's custody has not changed. The statute merely permits the State to change the place of confinement based upon an administrative determination that the juvenile "presents a continuing and serious threat to the safety of others in the institution." *RCW* 13.40.280(2).

The court rejected Monroe's jury-trial argument, finding that Washington's constitution, like New Jersey's, "has not been construed to guarantee the right of trial by jury in juvenile proceedings, and this proceeding remains juvenile in form and substance regardless of the site of incarceration." *Id.* at 210.

Nevertheless, the court recognized the need for real procedural safeguards prior to a transfer to an adult prison. The statute at issue in *Monroe* required the juvenile agency seeking the transfer to demonstrate the need for the transfer at "a hearing before a

review board," at which the juvenile would be represented by counsel.[5] *Id.* at 206 n. 1.

The court determined that juveniles were not entitled to a judicial hearing to approve the transfer, such as that required for a waiver to adult court under *Kent v. United States,* 383 *U.S.* 541, 86 *S.Ct.* 1045, 16 *L.Ed.*2d 84 (1966),[6] because the statute itself provided sufficient due process protections. *Monroe, supra,* 939 *P.*2d at 211. In reaching that conclusion, the court cited *Vitek v. Jones,* 445 *U.S.* 480, 494–95, 100 *S.Ct.* 1254, 1264–65, 63 *L.Ed.*2d 552, 566 (1980), which held, as stated in *Monroe, supra,* 939 *P.*2d at 211, that the "transfer of [an] adult prisoner to [a] mental institution at a minimum requires written notice, a hearing, an opportunity to present testimony, an independent decision-maker, [a] written statement of fact-finding, availability of legal counsel, and timely notice."

We prefer the approach taken by the Washington Supreme Court to that taken by the Louisiana Supreme Court because the former is consistent with our Legislature's recognition that New Jersey's juvenile justice system requires both "harsher penalties for juveniles who commit serious acts" and "alternative dispositions for juveniles committing less serious offenses." Committee Statement, *supra,* at 173. As our Supreme Court noted in *J.D.H., supra,* 171 *N.J.* at 483, 795 *A.*2d 851, our juvenile justice system focuses on both rehabilitation and punishment.

Because the Code, which has both rehabilitative and penal aspects, provides extensive procedural protections to juveniles and significantly reduces their exposures to incarceration, in addition to offering a number of alternative dispositions, we conclude that a transfer to an adult facility based upon a finding that the juvenile's

---

[5] Under the Washington statute, slightly different procedures requiring the juvenile to show why the transfer should not occur are applicable when there has been an assault against a staff member that has been reported to a law enforcement agency. *Monroe, supra,* 939 *P.*2d at 206 n. 1.

[6] *See State v. J.M.,* 182 *N.J.* 402, 410–19, 866 *A.*2d 178 (2005).

"continued presence in the juvenile facility threatens the public safety, the safety of juvenile offenders, or the ability of the commission to operate the program in the manner intended" does not, in the words of the Supreme Court of Louisiana, "upset[ ] the quid pro quo under which the juvenile system must operate." *C.B., supra,* 708 *So.*2d at 400.

Consequently, we conclude that the statute authorizing the transfer of custody "consistent with applicable state and federal standards," *N.J.S.A.* 52:17B–175(e), does not impinge on Jones' right to trial by jury.

### C.

We next turn to the issue of whether the regulations are "consistent with applicable state and federal standards," as required by *N.J.S.A.* 52:17B–175(e), focusing on their total lack of procedural due process. Jones argues that a juvenile subject to transfer is entitled to the full panoply of due process rights and a judicial hearing, while the State argues that the juvenile is not entitled to any form of due process.

Unlike the ordinary transfer of juveniles between juvenile facilities and of adults between state prisons, which the Legislature has left to the unfettered discretion of the JJC and DOC respectively, *see N.J.S.A.* 2A:4A–44(d)(1); *N.J.S.A.* 30:4–91.2, the Legislature has conditioned the transfer of a juvenile from the custody of the JJC to the custody of the DOC on a finding that the juvenile's "continued presence in the juvenile facility threatens the public safety, the safety of juvenile offenders, or the ability of the commission to operate the program in the manner intended," *N.J.S.A.* 52:17B–175(e). In addition, the transfer of a juvenile to an adult prison significantly changes the focus of the incarceration away from rehabilitation and toward security and punishment. For those reasons, we conclude that there must be a sufficient level of procedural due process to protect the juvenile's interests.

■ Although the full level of due process required by *Vitek* may not be appropriate, the rehabilitative purposes of the juvenile justice system combined with the importance of the decision in terms of the availability of rehabilitative services to juveniles at issue require due process at least as extensive as that required for prison discipline. *See Avant v. Clifford,* 67 *N.J.* 496, 525, 341 *A.*2d 629 (1975). At a minimum, before a juvenile can be transferred to custody of the DOC, there must be written notice of the proposed transfer and the supporting factual basis, an impartial decision maker, an opportunity to be heard and to present opposition, some form of representation,[7] and written findings of fact supporting a decision to proceed with the transfer.

Inasmuch as the Family Part judge has already determined that a juvenile subject to transfer should be incarcerated in the first place, we see no need for a referral to the Family Part to approve a proposed transfer of custody to the DOC. Once the decision to incarcerate has been made, the decision with respect to the appropriate place for incarceration is within the authority and expertise of the JJC. *N.J.S.A.* 2A:4A–44(d)(1) (JJC "shall provide for the juvenile's placement in a suitable juvenile facility."). Consequently, that body should make the final decision, with the concurrence of the DOC commissioner as required by *N.J.S.A.* 52:17B–175(e), after conducting the required hearing directly or through a hearing officer.

---

[7] The nature of the representation cannot be determined on this record. The record does not reflect whether legal assistance similar to "counsel substitutes" or some other form of legal assistance is available in juvenile facilities to assist juveniles in opposing a transfer request. In addition, it is not clear whether transferred juveniles are mixed with the adult population when they are transferred or segregated from adult offenders albeit housed in an adult prison, nor does the record reflect whether or not they continue to receive rehabilitative and other services available to juveniles at JJC facilities. Those factors would inform our consideration of whether there must be representation by counsel. We note that the State of Washington does require counsel, but that the requirement is statutory. *Monroe, supra,* 939 *P.*2d at 206 n. 1. It is not clear from the decision in Monroe whether the court would have required it as a matter of constitutional right, although the court did cite *Vitek,* which does require counsel.

Because *N.J.A.C.* 13:91–2.1 provides no due process rights to the juvenile as part of the transfer process, we hold that it is invalid. It does not comply with the statutory requirement that the transfer procedures be "consistent with applicable state and federal standards," particularly the juvenile's rights to due process. *U.S. Const.* amend. XIV; *see Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985) (Article I, Paragraph 1 of the New Jersey Constitution "safeguards values like those encompassed by the principles of due process and equal protection.").

## III.

For the reasons set forth above, we reverse the order transferring Jones to the custody of the DOC and order his return to the custody of the JJC. The JJC shall promptly revise its regulations to provide an appropriate level of due process consistent with this opinion. It may then seek to transfer Jones to the custody of the DOC with an appropriate hearing and procedural safeguards.

To the extent the JJC seeks to rely on the discipline arising from the October 13, 2011 incident with the juvenile corrections officer in seeking Jones' transfer, it must reconsider his appeal and provide a clear statement of its reasons for denying him appellate relief. Jones can, should he wish to do so, appeal that decision. Although Jones failed to file a timely appeal, we find it significant that his transfer to the custody of the DOC took place during the forty-five day appeal period. He commenced his efforts to challenge the transfer shortly thereafter.

Finally, in reviewing the record, we have noted that documents in the record, including the December 13, 2010 Family Intake Juvenile Pre–Disposition Report and the JJC's "Individualized Education Program" addressing June 2011 through June 2012, suggest that Jones may be developmentally disabled. Jones contends that his placement in a juvenile facility in the first place may have been inappropriate. *See N.J.S.A.* 2A:4A–44(c)(2); *State ex rel. R.M.,* 141 *N.J.* 434, 441–48, 661 *A.*2d 1277 (1995). Like any adjudicated juvenile, Jones has the right to petition the Family

Court for a recall hearing to address that issue. *R.M., supra,* 141 *N.J.* at 456, 661 *A.*2d 1277; *R.* 5:24–5 to –6.

Reversed and remanded.